**In re BRAVO ENTERPRISES USA, LLC, d/b/a Wellesley Inn of Lakeland, Debtor.**

**No. 8:02–BK–16946–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 23, 2005.

Brian J. Almengual, Tampa, FL, for Debtor.

## ORDER CONFIRMING AMENDED CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED

PAUL M. GLENN, Chief Judge.

THIS CASE came before the Court for a final evidentiary hearing to consider (1)

confirmation of the Amended Chapter 11 Plan of Reorganization filed by the Debtor, Bravo Enterprises USA, LLC, as modified on November 16, 2004, and again on November 17, 2004; (2) a Motion Pursuant to § 1129(b) of the Bankruptcy Code for "Cramdown" filed by the Debtor; (3) an Objection to Confirmation filed by the United States Trustee; and (4) an Amended Objection to Confirmation filed by General Electric Capital Corporation.

## Table of Contents

Background...................................................................462
    A.   The hotel ...........................................................462
    B.   The Plan ............................................................463
    C.   The Objections......................................................465
        1.  The United States Trustee ......................................465
        2.  GECC .........................................................465

Confirmation.................................................................465
    A.   Good faith ..........................................................467
        1.  The "missing" checks ...........................................467
            a.  The discrepancies..........................................467
            b.  The good faith issue.......................................468
        2.  The postpetition transfers ......................................470
            a.  Unauthorized transfers to insiders ..............................470
                1) The entities ...............................................470
                2) The transfers..............................................470
            b.  The good faith issue.......................................471
            c.  The monthly reports .......................................473
    B.   Feasibility .........................................................474
    C.   Fair and equitable..................................................476

Sanctions against Ampak .....................................................477

Conclusion..................................................................479

## Background

### A. The hotel

Bravo Enterprises USA, LLC (the Debtor) was formed on March 13, 2000, to acquire a 106–room hotel located in Lakeland, Florida. The hotel was operated under a Wellesley Inn & Suites franchise at the time that it was acquired.

Shortly after its formation, the Debtor entered into a Short Form Management Agreement with Ampak Group, Inc. (GECC's Exhibit 43). Pursuant to the Agreement, the Debtor appointed Ampak Group, Inc. as its "sole and exclusive agent for all purposes relating to the operation of the Hotel." Ampak, Inc. (Ampak) operates and manages the Debtor's hotel based on the Agreement (Transcript, Vol. I, p. 47). Javed Janjua (Janjua) is the president and one hundred percent shareholder of Ampak. (Transcript, Vol. I, p. 151).

In June of 2002, Wellesley Inn & Suites terminated the franchise agreement with the Debtor.

On August 29, 2002, approximately two months after the termination of the Wellesley franchise, the Debtor filed a petition under chapter 11 of the Bankruptcy

Code. The Schedules filed in the Chapter 11 case reflect that the Lakeland hotel constitutes the only real property owned by the Debtor, and the personal property listed on the Debtor's schedules consists of the receivables, inventory, and other assets associated with the hotel.

On October 17, 2002, the Debtor filed a Motion to Reject the franchise agreement with Wellesley Inn & Suites. (Doc. 29). The Motion was granted and the agreement was rejected on February 7, 2003. (Doc. 76).

On May 28, 2003, the Debtor entered into a new Franchise Agreement with Choice Hotels International, Inc. (Choice). (Debtor's Exhibit 7). Pursuant to the Agreement, Choice granted the Debtor a license to use its System and Marks, as defined in the Agreement, and to operate the Lakeland hotel as a Comfort Inn & Suites.

Addendum No. 1 was executed on the same date as the Franchise Agreement. (Debtor's Exhibit 7). Addendum No. 1 consists of an agreement by the Debtor to make the changes and additions listed in the Addendum to upgrade the Hotel to meet Choice's standards for operating a hotel as a Comfort Inn.

Janjua testified that Ampak spent $229,700.52 between November 1, 2003, and April 20, 2004, for the renovations to the hotel that were required by Choice. (Transcript, Vol. I, p. 83; Debtor's Exhibit 7).

Janjua further testified that representatives from Choice inspected the hotel on or about May 5, 2004. (Transcript, Vol. I, pp. 80–81). As a result of the inspection, Choice "turned on its reservation system" for the Debtor and allowed the hotel to operate as a Comfort Inn as of May 6, 2004. (Transcript, Vol. I, pp. 74, 80–81).

On May 18, 2004, the Debtor and Choice executed Addendum No. 2 to the Franchise Agreement. (Debtor's Exhibit 7). Addendum No. 2 consists of a "punchlist" of changes or upgrades to the hotel that were required by Choice, and a schedule by which the upgrades were to be completed. Janjua testified that the cost to complete the "punchlist" items set forth in Addendum No. 2 was approximately $100,000.00. (Transcript, Vol. I, p. 81).

As of November 16, 2004, Janjua testified that the hotel was operating as a Comfort Inn with an 82.7 percent occupancy rate and a $67.00 average daily room rate. (Transcript, Vol. I, p. 117).

### B. The Plan

The Debtor filed its Amended Chapter 11 Plan of Reorganization on February 5, 2004. (Doc. 140).

Generally, the Plan provides for the payment of all administrative claims on the date of confirmation. Janjua testified at trial that all administrative claimants other than the Polk County Tax Collector were being paid on a current basis, and that the Debtor had reached an agreement with the Polk County Tax Collector as to the terms for payment of the 2003 taxes. (Debtor's Exhibit 1; Transcript, Vol. I, pp. 60–61).

Second, the Plan as modified on November 16, 2004, provides that Wellesley Inn & Franchises, Inc. shall be treated as a general unsecured creditor. By agreement between the Debtor and Wellesley, Wellesley will be paid over a period of ten years in equal annual payments, a treatment that is less favorable than the treatment provided to other general unsecured creditors. (First Modification to Chapter 11 Plan, Doc. 433).

Third, the Plan as modified on November 17, 2004, provides as follows with re-

spect to the claim of General Electric Capital Corporation (GECC):

> GECC holds a first priority lien on substantially all of the Debtor's assets. The claim will be paid in full with contract interest (9.68%) either 24 months after Confirmation, or upon the expiration of the "pre-payment" penalty set forth in the mortgage note, which ever is later. Pending full payment the Debtor will make monthly payments of $29,847.00.

(Second Modification to Chapter 11 Plan, Doc. 438). The parties initially agreed at the final hearing that the principal amount of GECC's claim was $3,627,411.98. (Transcript, Vol. I, p. 13). Later in the hearing, however, the parties stipulated to a further modification of the Plan, "for the purpose of the cramdown requirements under 1129(b)," as follows:

> MR. MORSE: The interest rate is 9.68. We will agree that the balloon payment under the plan is two years, period. No extension for the prepayment penalty or yield maintenance premium time that we need to—we have agreed that they will waive that yield maintenance premium or prepayment penalty or whatever you want to call it.
>
> We will agree that they are, as an oversecured creditor, entitled to the default rate of interest during the term of the Chapter 11 case. My understanding is that default rate is an additional five percent over the contract rate.
>
> And we have agreed that the, either four or five payments that were missed at the very beginning of the case before I became involved—I think it was August, which may be prepetition, and then September, October, November and December of 2002, will also be added to the principal balance of the note for payment at the time of the balloon in 24 months.

(Transcript, Vol. I, pp. 134–35). According to the Agreement, the Debtor would make monthly payments of interest to GECC at the 9.68 percent contract rate based on the recalculated principal balance of the claim until the balloon payment is due. (Transcript, Vol. I, p. 135).

Fourth, the Plan provides that the holders of "small unsecured claims," defined as claims of less than $2,500.00, will be paid one hundred percent (100%) of the allowed amount of the claims in two equal installments, due ninety days after confirmation and one year after confirmation, respectively.

Fifth, the Plan provides that the holders of general unsecured claims in an amount of $2,500.00 or more, will be paid one hundred percent (100%) of their allowed claims in five equal annual installments, with the first annual payment due on March 30, 2005.

Finally, the Plan provides that the "interest of equity security holders shall be extinguished and new equity interests representing one hundred (100%) percent ownership and control of the Debtor will be issued to, and upon confirmation vest in Lakeland Mall Investments LLC." (Doc. 140, p. 4). Janjua is the sole member of Lakeland Mall Investments LLC. (Transcript, Vol. I, p. 58).

Article IV of the Plan, entitled "Means of Execution," states only that the Plan will be funded from future income. At trial, Janjua testified that Lakeland Mall Investments, LLC, of which he is the sole member, will be the owner of the hotel post-confirmation. (Transcript, Vol. I, p. 58). Janjua further testified that the hotel will "continue to operate as a Comfort Inn & Suites," and that Ampak will continue to manage the property. (Transcript, Vol. I, p. 57).

## C. The Objections

### 1. The United States Trustee

The United States Trustee (UST) primarily objects to the feasibility of the Debtor's Plan. (Doc. 212). Specifically, the UST contends that the Debtor had experienced a negative cash flow during much of its postpetition operations, and that the income projected by the Debtor in its Disclosure Statement is unreasonable. Based on historical revenues, the UST asserts that the Debtor will be unable to fund the payments to creditors as required by the Plan, after paying all of its routine and ongoing operating expenses.

The UST also objected to the proposed payment of Ampak's claim as an administrative expense, on the grounds that Ampak is an insider of the Debtor and should not be treated more favorably than general unsecured creditors. This objection is apparently resolved, however, since Ampak has withdrawn its request for payment of its claim as an administrative expense. (Doc. 437).

### 2. GECC

GECC objected to confirmation of the Debtor's Plan on six separate grounds. (Doc. 409).

First, GECC asserted that Janjua did not have the appropriate corporate authority to file the bankruptcy petition. This objection was ostensibly overruled at trial in connection with a similar challenge raised by Surinder and Narinder Basra, as shareholders of the Debtor. Specifically, the Court determined that such an objection is untimely, because the case had been pending for more than two years at the time that the objection was made. (Transcript, Vol. I, p. 10).

Second, GECC asserts that the Plan has not been proposed in good faith because a "fraud had been committed on Lender and this Court," and also because there were "numerous, unauthorized and undisclosed transfers of funds from the Debtor–in–Possession's bank account into the accounts of" other entities controlled by Janjua.

Third, GECC asserts that the Debtor has insufficient funds with which to pay administrative expenses and priority claims, including property taxes, attorney's fees, management fees, and GECC's administrative claim.

Fourth, GECC asserts that the Plan is not feasible because the Debtor has experienced losses during its postpetition operations, and because it will be unable to fund its future operating costs. GECC also contends that the "Historical and Projected Financial Information" attached to the Amended Disclosure Statement lacks adequate foundation to support certain prospective items contained therein, such as the increased occupancy and average daily rates, the "other income" in 2004, and the additional contributions by Janjua or his companies for further renovations.

Fifth, GECC asserts that the Plan is not "fair and equitable" with respect to GECC's claim, because it does not expressly provide that certain terms in GECC's loan documents will remain in effect postpetition, and also because it does not provide an appropriate rate of interest on GECC's secured claim.

Finally, GECC asserts that the Plan impermissibly permits Janjua to retain his equity interest in the Debtor, apparently in exchange for his contributions to the cost of the hotel's refurbishment, because Janjua has already received reimbursement for such contributions.

## Confirmation

■ Section 1129 of the Bankruptcy Code governs the confirmation of plans of reorganization in chapter 11 cases. Gen-

erally, a chapter 11 plan must be confirmed if it meets the thirteen requirements listed in § 1129(a). *Beal Bank, S.S.B. v. Waters Edge Limited Partnership*, 248 B.R. 668, 678 (D.Mass.2000). One of those requirements is that each class of impaired creditors must vote to accept the plan. Specifically, § 1129(a)(8) requires that:

> (8) With respect to each class of claims or interests—
>
> > (A) such class has accepted the plan; or
> >
> > (B) such class is not impaired under the plan.

11 U.S.C. § 1129(a)(8).

In this case, the Ballot Tabulation filed by the Debtor reflects that the creditors in Class 4 (GECC) and Class 7 (equity security holders) rejected the Plan. (Doc. 439). Consequently, the Debtor's Plan does not satisfy the requirement contained in § 1129(a)(8).

The Debtor's Plan may be confirmed despite the rejection by these two classes, however, if it meets the conditions set forth in § 1129(b)(1) of the Bankruptcy Code. *Beal Bank, S.S.B. v. Waters Edge Limited Partnership*, 248 B.R. at 678. Section 1129(b)(1) provides:

**11 USC § 1129. Confirmation of plan**

. . .

(b)(1) Notwithstanding section 510(a) of this title, *if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan,* the court, on request of the proponent of the plan, *shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable,* with respect to each class of claims or interests that

is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(Emphasis supplied). Section 1129(b)(1) is known as the "cramdown" provision of the Bankruptcy Code.

As set forth in the statute, there are two conditions for a plan to be confirmed or "crammed down" over the rejection by an impaired class of claims or interests. First, the Plan must satisfy all of the other requirements listed in § 1129(a), apart from the requirement that each class accept the plan. Second, the Plan must not discriminate unfairly, and must be fair and equitable with respect to each class of claims or interests that rejected the Plan. *Beal Bank, S.S.B. v. Waters Edge Limited Partnership*, 248 B.R. at 678.

The first step in the analysis under § 1129(b)(1), therefore, is to determine whether all of the requirements of § 1129(a), other than § 1129(a)(8), are satisfied by the Debtor's Plan.

In this case, GECC and the UST primarily contend that the Debtor's Plan does not satisfy the requirements contained in § 1129(a)(3) and § 1129(a)(11) of the Bankruptcy Code. Those two subsections provide:

**11 USC § 1129. Confirmation of plan**

> (a) The court shall confirm a plan if all of the following requirements are met:
>
> . . .
>
> (3) The plan has been proposed in good faith and not by any means forbidden by law.
>
> . . .
>
> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless

such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(3),(11). Consequently, the Court must determine whether the Debtor's Plan in this case satisfies the "good faith" requirement and the "feasibility" requirement set forth in subsections 1129(a)(3) and (a)(11) of the Bankruptcy Code.

## A. Good faith

GECC and the UST contend that the Debtor's Plan was not proposed in good faith for two primary reasons.

First they assert that the Debtor failed to make four payments to GECC in July, October, November, and December of 2003, and that copies of the alleged cancelled checks and bank statements relating to these four payments were altered at the time that they were produced by the Debtor. GECC further contends that the four "missing" payments were misrepresented by the Debtor on the Debtor–in–Possession reports that it filed with the Court. Finally, GECC and the UST assert that the Debtor was aware of the misconduct and misrepresentations at the time that the Plan was filed, with the result that the Plan is tainted with the Debtor's bad faith.

Second, GECC and the UST contend that "from the Petition Date through May, 2004, approximately $191,958.00 was transferred from the Debtor–in–Possession operating account to the accounts of BAS, Ampak, and/or Florida Financial, all of which are insiders and affiliated entities of the Debtor." (Doc. 409, p. 7). GECC and the UST contend that these postpetition transfers were made without authorization from the Bankruptcy Court, and that they were not disclosed on the DIP reports filed with the Court.

### 1. The "missing" checks

#### a. The discrepancies

Based on the evidence presented at trial, the Court is satisfied that GECC never received payment for July, October, November, and December of 2003. The Debtor produced copies of Check No. 010332 dated July 2, 2003, Check No. 010443 dated October 1, 2003, Check No. 010477 dated November 5, 2003, and Check No. 010523 dated December 3, 2003. (UST's Exhibit 15). Each check was made payable to Lennar Partners, GECC's predecessor, in the amount of $29,258.00.

Lynn McMillan (McMillan) is the bank operations manager for the Tampa region of SunTrust Bank. (Transcript, Vol. II, p. 153). McMillan testified that she researched the four checks in accordance with bank procedure, and determined that none of the checks had cleared the bank. (Transcript, Vol. II, pp. 158, 178).

Additionally, the bank statements for July, October, November, and December of 2003 reveal that the Debtor's DIP account contained insufficient funds to pay the checks on the dates shown on the back of the checks. (UST's Exhibit 16; Transcript, Vol. I, pp. 266–70).

The four checks payable to Lennar were never cashed and did not clear the bank.

Based on the evidence, the Court is also satisfied that the copies of the cancelled checks, and also the copies of the bank statements produced by the Debtor, were altered. The original checks and bank statements have not been produced. (Transcript, Vol. I, pp. 256–57, 262, Vol II, p. 77).

The copies of the checks produced by the Debtor included copies of both the front and the back of four checks. SunTrust Bank also produced copies of the backs of four checks bearing sequence numbers that are identical to the sequence

numbers on the backs of the checks provided by the Debtor. (UST's Exhibit 15). The Bank's records, however, show that the backs belong to checks other than the checks dated July 2, October 1, November 5, and December 3, 2003, as supplied by the Debtor. The back of one check, for example, bears sequence number 1300367910. According to the copy provided by the Debtor, this sequence number appears on the back of the check dated July 2, 2003. The Bank's records, however, show that this sequence number actually appears on the back of a separate check, check no. 010368 dated August 5, 2003, which was also made payable to Lennar Partners in the amount of $29,258.00, and which cleared the bank.

The implication, of course, is that the copies of the checks provided by the Debtor were falsified, in that the fronts of the four "missing" checks were wrongly paired with backs that belonged to other checks that had been negotiated. (Transcript, Vol. II, p. 170).

The copies of the bank statements produced by the Debtor were also altered. The four "missing" checks appear in the statements furnished by the Debtor by check number, amount, and date paid. (UST's Exhibit 16). Internal inconsistencies appear in the statements furnished by the Debtor, however, that were not explained at trial. In the July statement, for example, the itemization on page 3 shows that "24" checks were cleared during the month. A corresponding number at the top of page 3, however, reflects that only "23" checks were paid in July. (Transcript, Vol. II, p. 164). A similar discrepancy appears in the statements for October, November, and December of 2003.

Further, the bank statements provided by the Debtor differ from the statements that were produced from SunTrust's records. (UST's Exhibit 17). The four

"missing" checks are not listed in the statements produced by SunTrust. In SunTrust's July statement, for example, check number 10332 does not appear as a paid item in the amount of $29,258.00. In other words, the copy of the statement provided by the Debtor shows check number 10332 as paid, and the statement provided SunTrust omits such a payment. Despite this material difference ($29,-258.00) in the paid items, however, the account balances after the date of the "payment" are the same on both the statement provided by the Debtor and the statement produced by SunTrust. The same paradox occurs in connection with the dual set of statements for October, November, and December of 2003. (Transcript, Vol. I, pp. 273–77).

The copies of the statements furnished by the Debtor were altered and are not an accurate reflection of SunTrust's records. (Transcript, Vol. II, p. 169).

### b. The good faith issue

■ GECC and the UST contend that the Debtor's misconduct in connection with the four missing checks establishes that the Plan was not proposed in good faith within the meaning of § 1129(a)(3) of the Bankruptcy Code. Despite the convincing evidence that the copies of the checks and bank statements were altered, however, the record does not clearly establish how the alterations occurred, and does not clearly link the misconduct to any particular individual associated with the Debtor.

The UST and GECC attempted to establish Janjua's culpability through the testimony of four employees or former employees of Ampak. Specifically, Colleen Martin, Rana Wilson, and Gary Jones testified that they were employed by Ampak in 2003 or 2004, but that they never altered any bank statements or checks. (Transcript, Vol. III, pp. 25–26, 46–47,

57). Similarly, Rosabel Martinez testified that that she was employed by Ampak since July of 2003, but that she worked primarily with accounts payable and didn't generally review the bank statements or cancelled checks. (GECC's Exhibit, Deposition transcript of Roasbel Martinez, pp. 8–9, 71, 137).

Ampak's business is conducted through a small office with only 3 or 4 employees. Since the employees other than Janjua have all denied altering the documents, GECC and the UST conclude that only Janjua had the ability and the motivation to alter the bank statements and checks.

There is no direct proof, however, that Janjua is the party responsible for altering the documents. The original cancelled checks and bank statements were not admitted into evidence. (Transcript, Vol. I, pp. 256–57, 262, Vol. II, p. 77). Janjua testified that he did not personally sign the four checks. Instead, it appears that his signature may have been stamped on the checks, and Janjua has "no recollection who stamped" the checks. (Transcript, Vol. I, pp. 236, 238). The signature stamp was "frequently used." (Transcript, Vol. II, p. 14).

Further, Janjua personally asked Shamus McConomy, a commercial relationship manager with SunTrust, to investigate the "missing" checks, and even sent McConomy copies of the checks that are now at issue. (Transcript, Vol. I, p. 280; Vol. II, pp. 132, 134, 147). McConomy testified that Janjua was "under the impression that" the checks had cleared, and that Janjua appeared confused when told that the checks could not be located in the bank's system. (Transcript, Vol. II, pp. 134, 137, 148, 150).

Janjua testified repeatedly throughout the trial that he does not know what happened with respect to the four checks.

(Transcript, Vol. I, pp. 246, 251, 253, 255, 263, 273; Vol. II, p. 47).

In fact, it is unclear how Janjua could have altered the checks in the form in which they appear in the record. Processing numbers appear on the front of each of the four checks, for example, that generally are printed on checks only after they have been passed through a bank's coding system. (UST's Exhibit 15; Transcript, Vol. II, pp. 145–147). The appearance of these numbers on the fronts of the checks was not explained.

Further, apart from the absence of any direct proof that Janjua altered the checks, there also is no direct proof in the record that he altered the bank statements. Janjua testified that the copies of the statements furnished by the Debtor had been pulled from boxes located in the Debtor's office and placed in his in-box. (Transcript, Vol. I, pp. 257, 262).

On May 4, 2004, the Debtor filed a Motion for Relief from Order requiring the Payment of Adequate Protection. (Doc. 172). In the Motion, which was verified by Janjua, the Debtor alleged that "somebody employed by the Debtor or the Debtor's management company has provided [Janjua] with false financial information, false and altered bank statements, and false and altered copies of what were represented to be the canceled checks. Mr. Janjua has not yet been able to determine who within the organization has committed the acts but is actively investigating the matter." (Doc. 172, Para. 6). At trial, Janjua testified that "we have not been able to figure out who did what." (Transcript, Vol. I, p. 286).

Further, it is difficult to determine how the alterations to the bank statements were made, because the statements produced by SunTrust are not photocopies of the statements produced by the Debtor. SunTrust's statements are presented in a

different format, and were apparently reprinted or re-generated from the bank's computer. (UST's Exhibits 16, 17; Transcript, Vol. II, pp. 62–64).

In short, there is no direct evidence, and no compelling circumstantial evidence, proving that Janjua manipulated the bank records. Because the evidence is inconclusive as to any wrongdoing on the part of Janjua, the Debtor should not be accountable for the apparent misconduct.

The Court finds that the existence of the altered records does not establish that the Debtor's Plan was proposed in bad faith. The Plan satisfies the requirement for confirmation set forth in § 1129(a)(3) of the Bankruptcy Code.

### 2. The postpetition transfers

Next, the UST and GECC contend that the Debtor's Plan was not proposed in good faith because numerous transfers were made during the Chapter 11 case from the Debtor's operating account to the accounts of affiliated entities, and that the transfers were made without prior approval from the Court.

### a. Unauthorized transfers to insiders

### 1) The entities

Janjua owns a twenty-eight percent equity interest in the Debtor. Specifically, Janjua controls one hundred percent (100%) of a limited liability company known as Eagle Impex, LLC, which owns a twenty-eight percent interest in the Debtor. (Transcript, Vol. I, p. 147).

Ampak, Inc. is a "manager/member" of the Debtor. (UST's Exhibit 4). Janjua is the president of Ampak, Inc., and owns 100 percent of Ampak's shares. (UST's Exhibit 5; Transcript, Vol. I, p. 151). Further, as set forth above, Ampak manages the Debtor's hotel pursuant to a written Management Agreement. (GECC's Exhibit 43; Transcript, Vol. I, p. 47).

Florida Financial Services, Inc. d/b/a Ampak Financial Group (Florida Financial) is a "company that does financing for third parties." (Transcript, Vol. II, p. 10). Janjua is the president and owns 100 percent of Florida Financial's shares. (Transcript, Vol. I, p. 151).

BAS Hospitality V, LLC is an entity, also controlled by Janjua, that owned a hotel in Orlando. Janjua holds an equity interest in BAS Hospitality. (GECC's Exhibit 51; Transcript, Vol. I, pp. 148–50).

In summary, Janjua controls and either owns or partially owns an interest in four entities known as Bravo Enterprises USA, LLC (the Debtor), Ampak, Inc., Florida Financial Services, Inc., and BAS Hospitality V, LLC.

### 2) The transfers

The Debtor acknowledges that a series of transfers occurred between the Debtor, Ampak, Inc., BAS Hospitality, and Florida Financial during the postpetition period from December 2, 2002, until June 21, 2004.

A summary of "Intercompany Transfers" was admitted into evidence as the Debtor's Exhibit 9. The summary was prepared by Janjua. (Transcript, Vol. I, pp. 95–96).

The column on the far left of the exhibit shows the date of each transfer. The next four columns show the amounts that were transferred *from* Ampak, Florida Financial, the Debtor, or BAS Hospitality on a specific date. The middle column shows the specific accounts involved in the transfers. The next four columns show the amounts that were transferred *to* Ampak, Florida Financial, the Debtor, and BAS Hospitality on a specific date. Finally, the column on the far right of the exhibit

apparently shows the amount of the transfers only as between the Debtor and BAS Hospitality.

The summary shows, for example, that a series of transfers were made from the Debtor's account to the account of BAS Hospitality to cover the payroll for BAS Hospitality's hotel in Orlando. Such transfers occurred on December 20, 2002, and January 22, January 23, March 16, March 28, and April 9, 2003. The total amount of these transfers to Bas Hospitality's payroll account was $23,000.00.

Total amounts of all of the transfers "from" and "to" each of the four entities appear on Page 3 of the Debtor's Exhibit 9. With respect to the Debtor, the exhibit shows that the sum of $248,851.65 was transferred out of the Debtor's accounts, and that the sum of $145,807.45 was transferred into the Debtor's accounts, during the postpetition period from December 2, 2002, to June 21, 2004. (Debtor's Exhibit 9).

The Debtor contends that it did not actually experience a loss in the amount of $103,044.20 as a result of the transfers, however, because Ampak and Florida Financial made significant payments to third parties on the Debtor's behalf.

According to the Debtor, for example, Florida Financial made three payments to Morse & Gomez, P.A., the Debtor's attorneys, in June and July of 2004, and also made three mortgage payments to GECC's predecessor, Lennar Partners, in June, July, and August of 2004. The Debtor asserts that these six payments in the total amount of $103,541.00 were all made by Florida Financial on the Debtor's behalf. (Debtor's Exhibit 9).

Further, as set forth above, the Debtor entered into a Franchise Agreement with Choice on May 28, 2003. Addendum No. 1 and Addendum No. 2 to the Agreement list the changes or upgrades that Choice required the Debtor to make before operating the hotel as a Comfort Inn. The Debtor contends that Ampak, Inc., Florida Financial, and Janjua individually spent in excess of $229,700.52 to pay for the renovations required by Choice. The Debtor's Exhibit 7 is a three-page itemization of the expenditures that includes the date of each payment, the amount of each payment, the respective payee, and the reason for each payment. The expenditures in the total amount of $229,700.52 occurred between November 13, 2003, and April 20, 2004. (Debtor's Exhibit 7).

**b. The good faith issue**

■ GECC and the UST contend that the series of intercompany transfers and other postpetition transactions establish that the Plan was not proposed in good faith.

Janjua concedes that the Debtor never requested or obtained court approval for the transfers, and that the transfers were wholly unauthorized. (Transcript, Vol. I, pp. 94, 186, 195). Janjua also concedes that the transfers were not initially reflected in the Debtor's monthly financial reports. (Transcript, Vol. I, p. 188; Vol. II, pp. 23–26).

The transfers clearly constitute violations of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. See, for example, 11 U.S.C. § 363(b)(1), which provides that the "trustee [or debtor-in-possession], *after notice and a hearing*, may use, sell, or lease, other than in the ordinary course of business, property of the estate." (Emphasis supplied). See also, 11 U.S.C. §§ 364, entitled "Obtaining Credit," 11 U.S.C. § 549, entitled "Postpetition Transactions," and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure.

Despite the undisputed evidence of the violations, however, the Court cannot find that the unauthorized transfers establish the Debtor's lack of good faith in proposing its Plan.

■ The term "good faith" is not defined in the Bankruptcy Code. Instead, a plan's good faith is generally determined in light of the totality of the circumstances, and the bankruptcy judge is in the best position to evaluate the good faith of the proposed plan. *In re University Creek Plaza, Ltd.,* 176 B.R. 1011, 1018–19 (S.D.Fla.1995).

■ In reviewing the totality of the circumstances to evaluate whether the plan was proposed in good faith, courts generally concentrate on the plan itself, and its ability to accomplish the objectives of the Bankruptcy Code.

In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions. Denial of confirmation for lack of good faith "is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." The focus [when assessing good faith in the proposal of a plan] is on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." To determine good faith: the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code.

*In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 27–28 (Bankr.D.Kan.2001)(quoting *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir.1985))(quoted in *In re Global Water Technologies, Inc.,* 311 B.R. 896, 902 (Bankr.D.Colo.2004)). See also *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir.2002)("A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.") and *In re Star Trust,* 237 B.R. 827, 834 (Bankr.M.D.Fla.1999).

In this case, Janjua testified as follows regarding the reasons for the transfers:

A: ... When you have multi companies that have common ownerships, intercompany transfers is regularly—is pretty normal.

In our company, it's been very normal, too. We do intercompany transfers to—if somebody needs a funding, we'll fund it and then later on account for it, pay it back.

. . .

A: I think that was *the sole purpose of the transfers, was to get a franchise, make improvements.*

(Transcript, Vol. I, p. 93)(Emphasis supplied).

Based on his analysis, Janjua concluded that the Debtor received a net benefit of approximately $200,000.00 from the transfers. (Debtor's Exhibit 9; Transcript, Vol. I, p. 101).

Q: Okay. If we take out the mortgage payments and the payments to my firm, so that we'd only be focused on just, I guess, renovation costs and the franchise fees and operational type stuff, is the Debtor ahead or behind with respect to the payments—the transfers?

A: The Debtor is ahead about close to $200,000.

(Transcript, Vol. I, p. 101). In other words, Janjua asserts that the value that the Debtor received in the transfers ex-

ceeded the amount that it paid to Ampak and the other entities by approximately $200,000.00.

To support this conclusion, the Debtor employed Philip C. Piser (Piser), a certified public accountant, to review the transactions. (Transcript, Vol. II, p. 88). Although Piser's final figure differs from Janjua's, Piser also concluded that the Debtor received more than it transferred when all of the transfers were considered in their totality. After explaining the documentation that he relied on to form his opinion, Piser testified:

> A: ... Item ten is simply a summarization of all those different numbers. The first, again, indicating outflows from Bravo, payments made by Bravo to Ampak or related entities, for $55,689.06, net cash transfers over the two-year period we're talking about made by Bravo to Ampak or related entities, for $109,958, offset by the renovation costs of $229,700.52 and the other disbursements made by Bravo for—excuse me, made by Ampak, for $110,454.80, for *a net $174,508.26* amount paid by Bravo—excuse me, *paid by Ampak on behalf of Bravo in excess of those disbursements that had been made by Bravo on behalf of—or transfers made to Ampak.* And that's really the result of our work.

(Transcript, Vol. II, pp. 105–06)(Emphasis supplied). Consequently, Piser concluded that the value received by the Debtor exceeded the amount of its transfers by the sum of $174,508.26.

Finally, Janjua testified that the intercompany transfers were discontinued as soon as his attorney informed him that they were improper. (Transcript, Vol. I, p. 101).

The Court has considered the totality of the circumstances in this case, and finds that the Debtor's Plan was proposed in good faith within the meaning of § 1129(a)(3) of the Bankruptcy Code.

It appears that the unauthorized transfers, although improper, were intended to benefit the estate, and that the assets of the estate were not depleted as a result of the transfers. In fact, the Debtor's primary asset, the hotel, was improved while the Chapter 11 case was pending by virtue of the expenditures and upgrades. Consequently, it appears that the Debtor's ability to generate future revenue and repay creditors was enhanced because of the expenditures and the association with a franchise.

Finally, there is no evidence that the transfers were designed to frustrate the collection efforts of GECC or the Debtor's other creditors. On the contrary, the Plan proposes to pay GECC's claim in full within two years, and proposes a one hundred percent distribution to allowed unsecured claims.

In summary, the Plan proposes a result that is consistent with the objectives of the Bankruptcy Code, and satisfies the good faith requirement set forth in § 1129(a)(3).

#### c. The monthly reports

A final issue regarding the transfers concerns the omission of the transactions from the monthly operating reports that were originally filed by the Debtor.

The Debtor filed monthly operating reports for the months commencing in January of 2003 and extending through March of 2004. (UST's Exhibit 13).

The Debtor stipulated that its transfers with Ampak, Florida Financial, and BAS Hospitality were not included on the reports, and that the reports as originally filed were therefore inaccurate. (Transcript, Vol. I, pp. 188–90).

Janjua testified that he misunderstand the nature of the information that was required for the reports, and that his misunderstanding led to the omission of the transfers. Janjua testified, for example, that he believed that the reports only called for the disclosure of "disbursements," and that he did not view the intercompany transfers as "disbursements."

> Basically, you know, we treat intercompany transfers as receivables and payables, not as actual disbursements. So if I remember correctly, the way I tried to explain it was that—of course, now I realize it was a mistake, and we corrected all of the Dip reports.
>
> When you make an intercompany transfer from Company A to Company B, you're looking at Company A as a receivable being recorded, on Company B as a payable being recorded, so it really doesn't go through your P & L or your expenses. It's a receivable. It's kind of a balance sheet transaction. And that's why I don't think we recorded those on the DIP reports.

(Transcript, Vol. II, p. 24).

The error was ultimately brought to Janjua's attention by his attorney, and corrected reports were prepared and filed in August of 2004. (UST's Exhibit 23).

Clearly, a debtor cannot disregard the Operating Guidelines and Reporting Requirements of the United States Trustee. The disclosures made in the reports provide the information that enables the UST to fulfill its duties under 28 U.S.C. § 586.

Nevertheless, in this case, Janjua offered an explanation for the error, the Debtor filed corrected reports in the case, and the transfers were disclosed well in advance of the hearing to consider confirmation of the Plan. Under these circumstances, the Court will not deny confirmation of the Plan on the basis of the initial errors in the monthly operating reports.

## B. Feasibility

■ GECC and the UST assert that the Debtor's Plan should not be confirmed because it is not feasible as required by § 1129(a)(11) of the Bankruptcy Code. In other words, they contend that the Debtor will not be able to make the payments provided by the Plan, after funding its future operating costs.

■ Section 1129(a)(11) is designed only to prevent confirmation of "visionary schemes" that promise a greater distribution than the debtor could ever attain.

> The plan does not need to guarantee success, but it must present reasonable assurance of success. *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988). To provide such reasonable assurance, a plan must provide a realistic and workable framework for reorganization.

*In re Made in Detroit, Inc.*, 299 B.R. 170, 176 (Bankr.E.D.Mich.2003). "The feasibility test requires only a showing that the plan offers a reasonable assurance of success, not a guarantee of success." *In re New Midland Plaza Associates*, 247 B.R. 877, 884 (Bankr.S.D.Fla.2000).

In this case, the Debtor's Plan satisfies the test for feasibility set forth in § 1129(a)(11).

At trial, a Profit & Loss Statement was admitted into evidence as the Debtor's Exhibit 3. The Statement reflects actual revenues and expenses from 2001 through October of 2004, and projected revenues and expenses from November of 2004 through December 31, 2007.

In the Statement, the Debtor projected total revenues (primarily room revenues) for the 2005 calendar year in the amount of $1,661,905.00. For 2005, the Debtor then projected operating expenses in the

amount of $367,199.00 and overhead expenses in the amount of $671,821.00, so that the resulting projected "gross operating profit" for 2005 was $622,885.00. According to the Debtor, the sum of $128,000.00, representing projected "fixed expenses" was then subtracted from the "gross operating profit," leaving "income before debt service" in the amount of $494,885.00. At the time that the Statement was prepared, the debt service was estimated at $358,164.00, so that the total "net income from operations" was projected to be $136,721.00.

At the continued trial, a revised "Operating Budget" for 2005 was entered into evidence as GECC's Exhibit 60. In the revised budget, the Debtor's projected revenues for 2005 are $1,798,422.00, an increase of $136,517.00 over the revenues projected in the original Profit & Loss Statement. After various adjustments in the expenses, the revised budget reflects that the Debtor's total "net income from operations" for 2005 is projected at $278,815.00.

The revised budget includes debt service to GECC in the amount of $358,164.00. Based on the stipulation with GECC that was announced at trial, however, it appears that the debt service for 2005 may actually approach $396,000.00. Consequently, the projected "net income after operations," as revised in the most recent Operating Budget, may approximate $240,979.00 instead of $278,815.00.

Presumably, therefore, the sum of $240,979.00 should be available from the Debtor's operations to fund the payments to administrative claimants and unsecured creditors under the Plan in 2005. Additionally, Janjua testified that the Debtor's cash on hand as of January 20, 2005 totaled approximately $77,000.00. (Transcript, Vol. II, p. 68).

From these funds, the Debtor must pay the Polk County Tax Collector the sum of $10,000.00 per month for the 2003 taxes. Janjua testified that the balance of the 2003 taxes is $60,000.00. (Transcript, Vol. II, p. 55). Additionally, Janjua testified that the payment to unsecured creditors that is due in 2005 is in the approximate amount of $45,000.00 to $56,000.00. (Transcript, Vol. I, p. 129; Vol. II, p. 69). Other payments that may be owed during the year include the 2004 property taxes, the United States Trustee's fees, and the Debtor's legal fees. (Transcript, Vol. II, pp. 54–56).

Based on these projections, the Court is satisfied that the Plan has a reasonable assurance of success, and is not merely a visionary scheme.

This conclusion is supported by the fact that the Debtor has made substantial improvements to the hotel since 2003. As described above, Addendum No. 1 and Addendum No. 2 to the Franchise Agreement with Choice contain lists of improvements that Choice required before the hotel could be operated as a Comfort Inn. The Debtor completed the improvements and was permitted to operate as a Comfort Inn as of May 6, 2004.

Janjua testified extensively as to the specific renovations that were made. (Transcript, Vol. I, pp. 73–75, 78–79). Janjua also testified to the advantages of being associated with a large franchise, and receiving the benefits of the franchise's reservation system. (Transcript, Vol. I, pp. 108–09, 112–13). Finally, Janjua testified extensively as to the renewed marketing efforts that the Debtor has undertaken since operating as a Comfort Inn. (Transcript, Vol. I, pp. 113–16). These efforts include employing a full-time saleperson, enrolling as the host hotel for local and regional organizations, and advertising in various publications.

Under these circumstances, it appears that the Debtor will be able to approach or exceed its projections at least through 2005. Based on the projections, the Court finds that the Debtor has provided reasonable assurance that it will be able to make all the payments required by the Plan. Confirmation of the Plan is not likely to followed by the liquidation or further financial reorganization of the Debtor within the meaning of § 1129(a)(11) of the Bankruptcy Code.

## C. Fair and equitable

As discussed above, a plan may be confirmed over the rejection by an impaired class only if (1) it satisfies all of the other requirements listed in § 1129(a), and (2) it does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that rejected the plan. 11 U.S.C. § 1129(b)(1).

The Court has determined that the Debtor's Plan satisfies the requirements set forth in § 1129(a)(3) and § 1129(a)(11) of the Bankruptcy Code. The next issue, therefore, is whether the Plan does not discriminate unfairly and is fair and equitable to claims and interests that have rejected the plan.

■ The plan provides that GECC will retain the liens securing its claim, and provides for deferred cash payments to GECC in installments and amounts agreed between GECC and the Debtor. The Plan is fair and equitable with respect to GECC.

■ The Plan provides at Paragraph 2.7 that "the interest of the equity security holders shall be extinguished and new equity interests representing one hundred (100%) percent ownership and control of the Debtor will be issued to, and upon confirmation vest in Lakeland Mall Investments LLC." (Doc. 140, § 2.7). Janjua is the sole member of Lakeland Mall Investments LLC (Transcript, Vol. I, pp. 58, 180). Narinder and Surinder Basra currently claim to own a seventy percent (70%) interest in the Debtor. (Transcript, Vol. I, p. 6). The effect of Paragraph 2.7 of the Plan, therefore, is to extinguish the interest of the Basras, and to vest sole ownership of the Debtor in a company owned and controlled exclusively by Janjua.

Despite the obvious impact of Paragraph 2.7, the Court finds that the Plan is "fair and equitable," primarily because of Janjua's contributions to the estate.

Specifically, Janjua personally guaranteed the Franchise Agreement with Choice. (Debtor's Exhibit 7). Janjua testified that Choice required his guarantee as a condition to entering the Franchise Agreement, and that he is personally "on the hook for a few million bucks" if the Debtor defaults or the franchise is terminated. (Transcript, Vol. I, p. 77).

Additionally, Janjua provided services to the Debtor that were outside of the Management Contract between the Debtor and Ampak. At trial, for example, Janjua testified that the services that he provided to the Debtor included "hundreds of man-hours" dedicated to purchasing furniture, dealing with the contractors and work crews, and negotiating the franchise agreement. According to Janjua, these services are not included in the duties set forth in the Management Contract between the Debtor and Ampak. (Transcript, Vol. I, pp. 182–83). Janjua claims that the Management Contract covers only the operations of the hotel, and not services related to renovations and franchise conversion.

Finally, Janjua asserted that he "put up all the money" for the renovation of the hotel. (Transcript, Vol. I, p. 182). Janjua's contention in this regard is diluted because of the numerous intercompany

transfers that occurred among the Debtor, Ampak, Florida Financial, and BAS Hospitality. Nevertheless, Philip C. Piser, a certified public accountant who was engaged to review the transactions, testified that Ampak (a company owned solely by Janjua) essentially made a contribution of $174,508.26 to the Debtor while the Chapter 11 case was pending. (Transcript, Vol. II, pp. 105–06).

Janjua testified that he is not receiving any other compensation for his services to the Debtor, apart from the management fee owed to Ampak under the written agreement. (Transcript, Vol. I, p. 132). Additionally, the Court notes that Ampak has withdrawn its administrative claim that included substantial amounts of unpaid management fees. (Docs. 228 and 427).

This reorganization would not have been successful without the contributions of funds and efforts by Janjua, and the equity interests would have had no value.

A determination of whether a plan is "fair and equitable" must be made on a case-by-case basis. *In re Grandfather Mountain Limited Partnership*, 207 B.R. 475, 487 (Bankr.M.D.N.C.1996). In this case, Paragraph 2.7 of the Debtor's Plan provides for the termination of the existing equity interests, and the issuance of new equity interests to Lakeland Mall Investments LLC, a company owned solely by Janjua. For the reasons expressed above, the Court finds that the provision is fair and equitable.

### Sanctions against Ampak

■ The Court has previously found that numerous unauthorized transfers occurred while the Debtor's chapter 11 case was pending. Because the transfers were intended to improve the hotel, and because the Debtor and creditors ultimately benefited from the transfers, the Court concludes that the transfers, although improp-

er, do not establish that the Plan was proposed in bad faith.

The transfers were significant in both their frequency and their monetary impact, however, and cannot be condoned by the Court. Each transaction constituted a clear violation of the Bankruptcy Code. See, for example, 11 U.S.C. §§ 363, 364, and 549. Consequently, it is appropriate to fashion a remedy that will penalize the improper conduct that has occurred in this case, and that will also deter future violations of the bankruptcy process.

Section 105(a) of the Bankruptcy Code provides:

**11 U.S.C. § 105. Power of court**

■ (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). "It is within the inherent authority of the bankruptcy court to sanction conduct that violates the bankruptcy laws." *In re California Fidelity, Inc.*, 198 B.R. 567, 573 (9th Cir.BAP1996). In *California Fidelity*, the Bankruptcy Appellate Panel affirmed the imposition of sanctions against the principal of a debtor who had violated § 1125(b) of the Bankruptcy Code. See also *In re Four Seasons Marine & Cycle, Inc.*, 263 B.R. 764 (Bankr.E.D.Tex.2001).

In this case, the Court must exercise its authority under § 105(a) and impose sanctions against Ampak for the improper transfers that occurred among the Debtor, Ampak, Florida Financial, and BAS Hospi-

tality, while the Debtor was operating the hotel as a Debtor–in–Possession.

As set forth above, Ampak actually manages the Debtor's operations. At trial, Janjua described Ampak's role as manager as follows:

> A: Well, Ampak provides various services to the Debtor including legal services such as this, franchise negotiations, renovations, purchasing, human resources, risk management, insurance, asset management, day-to-day operations, oversee the hotel, accounting services, payroll services, It's just—*almost everything the Debtor does goes through Ampak* except the local line employees.

(Transcript, Vol. I, pp. 48–49)(Emphasis supplied). According to Janjua, therefore, Ampak handles the Debtor's overall business plan, and also the Debtor's daily operations. Janjua is the president of Ampak, Inc., and is also the sole owner of Ampak. (Transcript, Vol. I, p. 151). He essentially "controls" Ampak, Inc. (Transcript, Vol. I, p. 181). Consequently, Janjua is the president and sole owner of the entity that handles virtually all of the Debtor's business affairs. Janjua has acknowledged, for example, that he is the person responsible for handling the legal affairs of the Debtor related to its Chapter 11 case, and that he is responsible for making sure that the Debtor complies with all Court orders. (Transcript, Vol. II, p. 18). Janjua has also acknowledged that he is the only person with the authority to sign checks written on the Debtor's bank accounts since the filing of the Chapter 11 petition. (Transcript, Vol. I, p. 169). As the Debtor's chief officer and sole signatory, it is clear that Janjua is the individual responsible for the transfer of funds from the Debtor to the related entities. He authorizes the transfers, and supervises their timing and amount.

Janjua is an intelligent, articulate, and educated businessman, with a background in finance and accounting, and with extensive experience managing hotels. He has earned a Bachelor's degree in finance and accounting, and is a certified public accountant. He also holds a mortgage broker's license. (Transcript, Vol. I, p. 52). Janjua has been involved in the hotel business since 1980, including a term as the chief financial officer and chief operating officer of Suisse Properties, Inc., "about a $250 million dollar company." (Transcript, Vol. I, p. 53). He started his own business in 1986, purchased his first hotel in 1987, and acquired 26 hotels by 1990. "The total hotels that we've been involved in, if you include third party management, is probably over 50 something. We've managed over $1 billion in assets in the last 11 years or 12 years alone." (Transcript, Vol. I, p. 53).

Additionally, Janjua is familiar with the duties and obligations required of Chapter 11 debtors. Another of Janjua's companies, Ampak Hospitality Corp. of Indiana, previously filed a chapter 11 petition in this Court on February 1, 1996, which was assigned Case No. 96–1254. The case remained pending as a chapter 11 reorganization for more than two and one-half years, until it converted to a chapter 7 case on December 4, 1998. Janjua was the officer responsible for the decisions and operation of the debtor while it conducted its business as a chapter 11 debtor-in-possession.

Consequently, Janjua was aware of the fiduciary responsibilities associated with managing a Debtor–in–Possession's funds. In fact, he testified that he had a "general sense of what a fiduciary is." (Transcript, Vol. I, p. 176). Perhaps more importantly, however, Janjua admittedly knew that Debtor–in–Possession bank accounts must

be maintained separately from other accounts.

A: No. The debtor-in-possession accounts are set up totally differently than our normal businesses, and they were obviously debtor-in-possession accounts and they were kept separate from our other accounts.

(Transcript, Vol. I, p. 92). Janjua was aware that a debtor's funds were to be segregated from the funds of other entities, and that they were subject to strict accounting standards.

Further, orders were entered during the course of the chapter 11 case that specifically limited the Debtor's use of its revenues. On October 30, 2002, for example, the Court entered an Order Granting Motion for Authority to Use Cash Collateral, which stated that "[n]o distribution shall be made from cash collateral to any insider or affiliate of the Debtor unless and until expressly authorized by further Order of this Court." (Doc. 44). On January 24, 2003, the Court entered an Order Granting Motion to Enter into Franchise Agreement, which provided that "no payments are to be made by the debtor from cash collateral." (Doc. 68). The record reflects that both Orders were served on the Debtor and the Debtor's attorney.

The violations were clear violations of the Bankruptcy Code and orders of the Court. The Court finds, therefore, that Ampak should be held accountable for the postpetition transfers between the Debtor and the other entities controlled by Janjua that were made in violation of the Bankruptcy Code.

The Court reaches this conclusion even though it previously found that the transfers did not establish the Debtor's lack of good faith in proposing the Plan. The issue of whether the Plan was proposed in good faith involves a completely separate analysis from the issue of whether Ampak knowingly initiated and carried out the improper transfers.

Pursuant to § 105(a) of the Bankruptcy Code, therefore, it is appropriate to sanction Ampak for the violations of the provisions of chapter 11.

Under the circumstances of this case, the Court finds that Ampak should be ordered to pay the sum of $7,500.00 to GECC as a partial reimbursement of the attorney's fees incurred by GECC in connection with the protection of its secured claim. The Debtor acknowledges that GECC holds a first priority lien on substantially all of the Debtor's assets, including the Debtor's receivables and room revenues. (GECC's Exhibits 38, 39). Consequently, GECC's secured interest was directly affected by the unauthorized postpetition transfers that occurred in the case, and GECC was required to employ its attorneys to protect that interest.

Accordingly, within thirty (30) days of the date of this Order, Ampak shall pay to GECC the sum of $7,500.00 as a partial reimbursement of the attorney's fees incurred by GECC in this case. The Court finds that such an Order is necessary and appropriate to carry out the provisions of title 11, as permitted by § 105(a) of the Bankruptcy Code.

### Conclusion

The Court finds that the Debtor's Amended Chapter 11 Plan, as modified, satisfies the requirements for confirmation set forth in § 1129(a) and § 1129(b)(1) of the Bankruptcy Code, and should therefore be confirmed. Specifically, all of the requirements contained in § 1129(a), except the requirement that each impaired class of claims and interests has accepted the plan, are satisfied in this case. The Court finds, for example, that the Plan has been proposed in good faith and not by any means forbidden by law, as required

by § 1129(a)(3), despite evidence that copies of certain checks and bank statements were altered during the case, and also despite the occurrence of numerous postpetition transfers that were not authorized by the Court.

The Court also finds that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, as required by § 1129(a)(11) of the Bankruptcy Code.

Further, the Court finds that the Plan is "fair and equitable" with respect to each class that rejected the Plan, within the meaning of § 1129(b)(1), despite the provision for the issuance of new equity interests to an entity owned solely by Janjua.

The Plan should be confirmed over the objection of the UST and GECC pursuant to § 1129(b)(1) of the Bankruptcy Code.

Finally, however, the Court finds that the unauthorized postpetition transfers constitute clear violations of the Bankruptcy Code, and that it is appropriate to fashion a remedy that will penalize the improper conduct and deter future violations. Since Ampak was responsible for the management of the Debtor, and since the violations are not excusable, Ampak should be ordered to pay the sum of $7,500.00 to GECC, the primary secured creditor in this case, as partial reimbursement for the attorney's fees incurred by GECC to protect its interest.

Accordingly:

**IT IS ORDERED** that:

1. The Amended Chapter 11 Plan of Reorganization of the Debtor, Bravo Enterprises, USA, LLC, as modified on November 16, 2004, November 17, 2004, and at the final evidentiary hearing, is confirmed.

2. The Motion Pursuant to § 1129(b) of the Bankruptcy Code for "Cramdown" filed by the Debtor, Bravo Enterprises, USA, LLC, is granted.

3. The Objection to Confirmation filed by the United States Trustee is overruled.

4. The Amended Objection to Confirmation filed by General Electric Capital Corporation is overruled.

5. Within thirty (30) days of the date of this Order, Ampak, Inc. shall pay to General Electric Capital Corporation the sum of $7,500.00 as a sanction imposed pursuant to § 105(a) of the Bankruptcy Code.