**In re PROUD MARY MARINA CORPORATION, Debtor.**

**No. 8:02–BK–527–PMG.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 19, 2006.

---

116

Stephen R. Leslie, Elena Paras Ketchum, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for debtor.

Louis L. Long, Jr., Chesser & Barr, P.A., Shalimar, FL, Richard A. Childs, Richard A. Childs, P.C., Columbus, GA, for Kathy Ridley.

**ORDER (1) CONFIRMING AMENDED CHAPTER 11 PLAN OF REORGANIZATION FILED BY KATHY RIDLEY; (2) DENYING CONFIRMATION OF SECOND AMENDED CHAPTER 11 PLAN OF THE DEBTOR; (3) DENYING RIDLEY'S MOTION TO FIX THE AMOUNT OF ALL CLAIMS AND ADMINISTRATIVE EXPENSES FOR CONFIRMATION; (4) DENYING DEBTOR'S MOTION FOR ORDER VACATING ORDER APPROVING DISCLOSURE STATEMENT OF KATHY RIDLEY; AND (5) GRANTING DEBTOR'S MOTION FOR ESTIMATION OF APPLICATION FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS OF KATHY RIDLEY**

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for hearing to consider (1) confirmation of the Amended Chapter 11 Plan of Reorganization filed by Kathy Ridley; (2) confirmation of the Second Amended Chapter 11 Plan of the Debtor; (3) Ridley's Motion to Fix the Amount of All Claims and Administrative Expenses for Confirmation; (4) the Debtor's Motion for Order Vacating Order Approving Disclosure Statement of Kathy Ridley; and (5) the Debtor's Motion for Estimation of Application for Payment of Administrative Expense Claims of Kathy Ridley.

The Debtor, Proud Mary Marina Corporation, and Kathy Ridley (Ridley) have filed competing Chapter 11 Plans in this case. The preliminary issue for the Court to determine, therefore, is whether one or both of the Plans is confirmable. *In re Holley Garden Apartments, Ltd.,* 238 B.R. 488, 493 (Bankr.M.D.Fla.1999).

Based on the testimony and documents presented at a full-day evidentiary hearing, the Court finds that the Amended Chapter 11 Plan of Ridley satisfies the requirements for confirmation set forth in § 1129(a) of the Bankruptcy Code, and that Ridley's Plan should be confirmed.

The Court further finds that the Second Amended Chapter 11 Plan of the Debtor does not satisfy the requirements for confirmation set forth in § 1129(a)(3) or § 1129(a)(11) of the Bankruptcy Code. Consequently, the Debtor's Plan should not be confirmed.

## TABLE OF CONTENTS

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .117
   A.  The Chapter 11 case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .117
   B.  Claims against the estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .119
       1.  Secured claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .119
       2.  Professional fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .120
       3.  Other administrative expense claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .121
       4.  Unsecured claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .122
       5.  Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .122
Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .122
   A.  General requirements for confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .122
       1.  Good faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .123
       2.  Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .123
   B.  The Debtor's Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .123
       1.  Good faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .124
       2.  Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .126
   C.  Ridley's Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .128
       1.  Good faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .128
       2.  Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .129
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .131

## Background

Prior to the filing of its Chapter 11 petition, the Debtor operated a mobile home park (the Park) in Citrus County, Florida. The Park was situated on approximately ten acres of real property located on the Homosassa River, and included fifty boat slips.

### A. The Chapter 11 case

The Debtor filed its Chapter 11 case on January 11, 2002.

On its schedule of assets, the Debtor listed the real property upon which the Park is situated (10391 W. Fishbowl Drive, Homosassa, Florida) at a value of $3,000,000.00. The Debtor also listed real property located at 4908 Chauncey Point in Homosassa, with a value of $7,500.00. The Chauncey Point property is a vacant lot adjacent to the Park. (Transcript, p. 150).

On its schedule of liabilities, the Debtor disclosed that the Park was encumbered by a first mortgage held by Joyce and Vessie Miller in the amount of $600,000.00, and by a second mortgage held by Sports-man's Cove Partnership in the amount of $38,945.00.

Carole Steigele was listed as the primary unsecured creditor of the Debtor, with a scheduled claim of $125,000.00.

The Debtor filed its original Plan of Reorganization and Disclosure Statement on October 25, 2002. (Docs. 31, 32). An Order Approving the Disclosure Statement was entered on January 29, 2003. (Doc. 45). The hearing to consider confirmation of the Plan of Reorganization was initially deferred, however, pending resolution of the Debtor's Objection to a Proof of Claim filed by Lawrence and Carole Steigele in the amount of $396,337.00. (Doc. 74).

On March 11, 2004, an agreed Order was entered allowing the claim of Carole Steigele in a reduced amount "not to exceed $60,000.00," payable at the rate of $1,000 per month commencing on the first month following Carole Steigele's 65th birthday. (Doc. 131).

Following the entry of the Order on Carole Steigele's claim, the Court scheduled a hearing to consider confirmation of the Debtor's Chapter 11 Plan. (Doc. 136).

On May 3, 2004, the day scheduled for the confirmation hearing, the Debtor filed an Amended Plan of Reorganization. (Doc. 141). Generally, the Amended Plan provided for payment of all allowed secured and unsecured claims in installments "out of profits derived from Debtor in the ordinary course of business." (Doc. 141, Article IV). The Steigele claim was treated in a separate class, and the amount of remaining unsecured claims were to be paid only 50%, in annual installments of 10% for 5 years.

The Court orally confirmed the Debtor's Amended Plan of Reorganization at the hearing on May 3, 2004. As is customary, the Debtor's attorney was asked to provide a proposed Order Confirming Plan for consideration and entry by the Court. (Ridley's Exhibit 5, Transcript of May 3, 2004, hearing, p. 9; Rules 3020–1(b) and 9072–1, Local Rules). In the weeks following the confirmation hearing, however, no proposed, written Order Confirming Plan was submitted to the Court for entry.

On August 9, 2004, three months after the confirmation hearing, Ridley filed a Motion to Convert Case to Chapter 7 or in the Alternative, to Appoint Chapter 11 Trustee. (Doc. 147). The Motion was based on the "concealment of an existing contract to sell all or substantially all of the Debtor's real property for $2,500,000.00 and failure to disclose said sale of the Debtor's assets to creditors or the Court." (Doc. 147).

On August 10, 2004, a similar Motion to Appoint Chapter 11 Trustee was filed by Sportsman's Cove Partnership. (Doc. 148).

Also on August 10, 2004, the Court entered an Order Confirming Plan pursuant to the ruling at the confirmation hearing on May 3, 2004. (Doc. 152).

The next day, August 11, 2004, Ridley and Sportsman's Cove Partnership filed separate Motions for Rehearing in which they requested the entry of an Order revoking the Order Confirming Plan. (Docs. 154, 156).

On September 14, 2004, the Court entered an Order Granting the Motions filed by Ridley and Sportsman's Cove Partnership. (Doc. 179). In the Order, the Court made the following specific findings:

2. Andrea Trani and Helene Provenzano, who are principals and stockholders of the Debtor, entered into a contract on February 29, 2004, in their individual capacities, to sell the real property of the estate knowing that the property belonged to the debtor (the "Contract"); and

3. The sum of $45,000.00 was paid by the purchaser as a deposit pursuant to the terms of the Contract, of which one of the principals received $22,500.00, and the other principal knew about the receipt of the funds. According to Andrea Trani's testimony, the funds received by the principal were used to remedy code violations [at the Debtor's property]. The remaining $22,500.00 was placed in escrow with ... the closing agent; and

. . . . .

5. The Contract was to sell substantially all of the assets of the debtor. The Contract was clearly a significant development in the case, but no mention of the Contract was made in the debtor's D.I.P. [Debtor in Possession] report for the month in which the contract was entered. Further, there was no mention of the $45,000.00 payment for the deposit in the D.I.P. report for the month in which the payment was received; and

6. In addition, an Amended Plan was filed on May 3, 2004, and made no mention of the pending Contract, and in fact the Amended Plan states that the plan

would be funded out of profits in the ordinary course of business.

Based on these and other findings, the Court concluded that "significant material omissions" had occurred in the case, and vacated the Order Confirming Plan. (Docs. 179, 196).

On October 1, 2004, Ridley filed a Chapter 11 Plan and Disclosure Statement. (Docs. 187, 188).

On October 14, 2004, the Debtor filed a Second Amended Plan and Second Amended Disclosure Statement. (Docs. 194, 195).

On August 3, 2005, Ridley filed an Amended Chapter 11 Plan and an Amended Disclosure Statement. (Docs. 492, 493).

### B. Claims against the estate

To evaluate the competing Plans filed by the Debtor and Ridley, the Court must first determine the extent of the secured and unsecured claims that have been asserted in this case.

### 1. Secured claims

On June 30, 2005, the Court entered an Order Granting in Part Debtor's Motion for Authority to Obtain Credit under 11 U.S.C. § 364. (Doc. 429). In the Order, the Court authorized the Debtor to borrow from HUDO Lending, LLC (HUDO) "an amount sufficient to satisfy the secured claim of Joyce Miller in the amount agreed to by the parties ($885,000), to satisfy the priority tax claim of the Citrus County Tax Collector, to fund the operations of the Debtor for a period of three months (not to exceed $3,000), and to pay the fees and costs associated with the closing of the DIP Facility." (Doc. 429, p. 5).

Pursuant to the Order, to secure the loan, HUDO was "granted (effective immediately and without the necessity of the execution or filing by the Debtor of a security agreement, financing statements, mortgages, lien waivers, consents or otherwise), pursuant to Section 364(c) and 364(d) of the Bankruptcy Code, a first priority senior security interest in and lien upon the Proud Mary Property, senior in all respects to any and all present and future liens or claims, if any, that encumber the Proud Mary Property." (Doc. 429, p. 9).

The secured claim of Joyce and Vessie Miller, and the claim of the Citrus County Tax Collector, were satisfied with the proceeds of the loan from HUDO. (See Doc. 456, Agreed Order on Debtor's Objection to Claim No. 5 Filed by Joyce and Vessie Miller and Resolving Other Claims Filed by Joyce and Vessie Miller; and Docs. 501 and 502, Withdrawals filed by Citrus County Tax Collector).

HUDO has advanced the sum of $1,005,925.30 to the Debtor pursuant to the Court-approved "DIP Facility." (Debtor's Exhibit 17; Transcript, p. 172).

Consequently, it appears that HUDO Lending, LLC is the primary secured creditor of the Debtor as the holder of a postpetition, senior lien in the approximate amount of $1,005,925.30.

Sportsman's Cove Partnership also holds a lien on the Debtor's property. On June 4, 2003, the Court entered an Order allowing the secured claim of Sportsman's Cove Partnership in the amount of $40,721.58. (Doc. 86). The allowed secured claim was subsequently transferred to Fishbowl Marina, Inc. (Doc. 304).

Finally, Swan Family Ltd. and First Union filed a secured claim (Claim No. 2) in the amount of $13,776.39. Claim No. 2 is apparently based on a tax certificate arising from the Debtor's real estate taxes for the year 2000. No objection to Claim No. 2 has been filed.

Based on the foregoing, it appears that the secured claims in this case total the

approximate principal sum of $1,060,423.27 ($1,005,925.30 + $40,721.58 + $13,776.39 = $1,060,423.27).

### 2. Professional fees

On June 3, 2005, the Court entered an Order Approving Trenam, Kemker's Application for Award of Fees and Costs as Counsel for the Debtor. (Doc. 411). In the Order, the Court awarded Trenam, Kemker the sum of $50,520.93 as an administrative expense claim for professional services.

On November 23, 2005, the Court entered an Order Approving Application and Supplemental Application for Allowance of Fees and Reimbursement of Costs Filed by Morse & Gomez, P.A. as Counsel for the Debtor. (Doc. 582). In the Order, the Court awarded Morse & Gomez, P.A. the sum of $10,223.01 as an administrative expense claim for postpetition professional services provided to the Debtor.

As of the date of this order, four other applications for the payment of professional fees have been filed and remain pending. They are:

1. The Application of Peggy Burke BeVille for Allowance of Compensation as attorney for Sportsman's Cove Partnership (Doc. 267). The Application seeks the sum of $7,440.00 in fees, and $812.74 in costs, for a total amount of $8,252.74. The claim has been assigned to Fishbowl Marina, Inc. (Doc. 304).

2. The Application for Allowance of Attorney's Fees for Kathy Ridley filed by Chesser & Barr, P.A. (Doc. 272). The Application seeks $36,976.37 in actual fees and costs, and $18,625.00 in estimated fees and costs, for a total amount of $55,601.37.

3. The Application of Attorney for Interim Compensation for Postpetition Representation of Kathy Ridley filed by Richard A. Childs, Attorney at Law, P.C. (Doc. 275). The Application seeks $16,075.00 in fees, and $7,527.80 in expenses, for a total amount of $23,332.80.

4. The Application of Stichter, Riedel, Blain & Prosser, P.A. for Allowance and Payment of Compensation for Services Rendered and Reimbursement of Expenses Incurred as Attorneys for Debtor (Doc. 462). The Application seeks $58,612.50 in fees, and $1,210.08 in costs, for a total amount of $59,822.58.

Objections have been filed to all of the pending Fee Applications except the Application of Stichter, Riedel, Blain & Prosser, P.A.

Ridley has filed a Motion to Fix the Amount of all Claims and Administrative Expenses for Confirmation. (Doc. 319). She contends that she must know the final amount of all claims and administrative expenses as of the date of the confirmation hearing, so that she can be prepared to pay the claims in the event that her Plan is confirmed. The Motion is directly relevant to the requests for professional compensation, because of the number of Fee Applications filed and the amounts involved.

Ridley's Motion should be denied to the extent that it seeks the entry of an Order that conclusively establishes the amount of the compensation to be awarded to all of the professionals who have filed applications in this case, and that also conclusively establishes the amount of all other claims asserted against the estate. Each Application and each claim will be determined individually on its merits, after notice and an opportunity to be heard has been afforded to all interested parties.

For purposes of evaluating the confirmability of the competing Plans, therefore, the Court will treat all of the pending Applications for compensation as claims asserted against the estate, which must be

provided for by the respective Plans until they are disallowed.

Based on all of the Applications described above, therefore, the Court finds that the total amount of compensation requested from the estate equals the sum of $207,753.43 ($50,520.93 + $10,223.01 + $8,252.74 + $55,601.37 + $23,332.80 + $59,822.58 = $207,753.43).

### 3. Other Administrative Expense Claims

On January 10, 2005, Ridley filed an Application for Payment of Administrative Expense Claim (Breach of Contract), in which she seeks the sum of $5,000,000.00 from the Chapter 11 estate. (Doc. 273). The Application is based on a Vacant Land Contract dated February 29, 2004, pursuant to which Ridley agreed to purchase the Debtor's real property located at 10391 West Fish Bowl Street in Homosassa for the purchase price of $2,500,000.00.

In the Application, Ridley alleges:

The Debtor breached the post-petition Contract with Ridley, and Ridley has suffered damages and will suffer further damages as a result of the Debtor's breach of contract. If the Contract does not ultimately close Ridley's damages for breach of contract will exceed the sum of $5,000,000.00, for all of which Ridley asserts an administrative expense claim.

(Doc. 273, p. 3).

Ridley also filed an Application for Payment of Administrative Claim (General Out of Pocket Expenses), in which she seeks the sum of $108,610.00 from the estate, based on disbursements that she made in relation to the Vacant Land Contract. (Doc. 274). The disbursements include payment of an earnest money deposit in the amount of $45,000.00, and also payments for the removal of mobile homes located on the property ($34,160.00 and $20,000.00), for an appraisal ($4,800.00), for a survey ($2,750.00), and for an environmental survey ($1,500.00).

The Debtor has filed a Motion to estimate Ridley's $5,000,000.00 breach of contract claim pursuant to § 502(c)(2) of the Bankruptcy Code. (Doc. 517). In the Motion, the Debtor requests that the Court estimate Ridley's claim at "zero," or disallow the claim in its entirety, because the claim is not supported by any documentation or other evidence. The Debtor also asserts that the claim was filed in large part to undermine its efforts to confirm a Plan.

The Court finds that the breach of contract claim should be estimated at "zero" for purposes of confirmation.

First, the Vacant Land Contract identifies Andrea Trani and Helene Provenzano as the "sellers," and Trani and Provenzano signed the Contract in their individual capacities. The Debtor is not a party to the contract, even though it is the owner of the property. Consequently, to the extent that Ridley holds a valid claim for breach of contract, it appears that the claim may be against the individuals, and not against the Debtor as a non-party to the agreement. In fact, in a separate adversary proceeding commenced by Ridley, Ridley alleges in Count I that her cause of action based on breach of contract "is as to Defendants, Helene Provenzano and Andrea Trani." (Adv. Pro. 05–595, Doc. 1, Count I). Ridley did not include the Debtor in her breach of contract count, even though the Debtor is named as a defendant in other counts of the Complaint.

Additionally, during discovery taken in this case, Ridley was not able to demonstrate any specific basis for the damages requested, other than her opinion as a realtor that "the property might be worth close to $5 million." (Ridley's Exhibit 1,

Deposition of Ridley, p. 89). According to Ridley, her opinion of the value of the property is based on her "gut feeling" as a real estate agent and "the way things have gone before." (Ridley's Exhibit 1, p. 92). Ridley also testified at her deposition that she had no documentation to support the amount of the damages sought in her claim. (Ridley's Exhibit 1, p. 95; Transcript, p. 269).

Since the Debtor was not a party to the Vacant Land Contract, and since Ridley has not identified any independent evidence to support the amount of the damages asserted, Ridley's breach of contract claim against the estate should be estimated at "zero" for purposes of considering confirmation of a Plan in this case.

Ridley's Application for out of pocket expenses, however, should be treated as a pending claim against the estate for $108,610.00 for purposes of confirmation.

### 4. Unsecured claims

Two unsecured claims were filed in this case. The Homosassa Water District filed Proof of Claim Number 4 in the amount of $925.00, and Carole and Lawrence Steigele filed Claim Number 9. The claim of Carole Steigele has been allowed in an amount "not to exceed $60,000.00." (Doc. 131).

Accordingly, the unsecured claims in this case total the sum of $60,925.00.

### 5. Summary

For purposes of evaluating the competing Plans filed by the Debtor and Ridley, therefore, it appears that claims are pending against the estate as follows: secured claims totaling $1,060,423.27, claims for professional fees totaling $207,753.43, other administrative expense claims totaling $108,610.00, and unsecured claims totaling $60,925.00.

### Discussion

As set forth above, the Debtor and Ridley have filed competing Chapter 11 Plans in this case, and the Court must determine whether one or both of the Plans is confirmable.

### A. General requirements for confirmation

Section 1129 of the Bankruptcy Code governs the confirmation of plans of reorganization in Chapter 11 cases. Subsection (a) of § 1129 lists thirteen requirements for confirmation of a plan. *In re Bravo Enterprises USA, LLC,* 331 B.R. 459, 465–66 (Bankr.M.D.Fla.2005)(citing *Beal Bank, S.S.B. v. Waters Edge Limited Partnership,* 248 B.R. 668, 678 (D.Mass. 2000)).

The two requirements for confirmation that are at issue in this case arise under subsection (a)(3) and subsection (a)(11) of § 1129. (See Doc. 312, Ridley's Objection to Confirmation of the Second Amended Chapter 11 Plan of the Debtor, and Doc. 478, Debtor's Objection to Confirmation of Chapter 11 Plan of Reorganization Filed by Kathy Ridley). Those subsections provide:

**11 USC § 1129. Confirmation of plan**

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . . .

(3) The plan has been proposed in good faith and not by any means forbidden by law.

. . . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless

such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(3), (a)(11). In other words, in this case the Court must determine whether the proposed Plans satisfy the "good faith" requirement and the "feasibility" requirement set forth in § 1129.

### 1. Good faith

█ The term "good faith" is not defined in the Bankruptcy Code. Typically, a plan's good faith is determined in light of the totality of the circumstances. *In re Bravo Enterprises*, 331 B.R. at 472(citing *In re University Creek Plaza, Ltd.*, 176 B.R. 1011, 1018–19 (S.D.Fla.1995)).

█ In reviewing the totality of the circumstances, courts generally focus on the plan proposed, and the ability of the plan to achieve the objectives of the Bankruptcy Code. *In re Bravo Enterprises*, 331 B.R. at 472.

> In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions.... The focus [when assessing good faith in the proposal of a plan] is on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." To determine good faith: the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code.

*In re Valley View Shopping Center, L.P.*, 260 B.R. 10, 27–28 (Bankr.D.Kan.2001)(quoting *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985))(quoted in *In re Global Water Technologies, Inc.*, 311 B.R. 896, 902 (Bankr.D.Colo.2004)). See also *In re Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir.2002)("A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code.").

### 2. Feasibility

█ The "feasibility" requirement is contained in subsection (a)(11) of § 1129. The requirement is designed primarily to prevent confirmation of "visionary schemes" that promise a greater distribution than the debtor or plan proponent could ever attain. *In re Bravo Enterprises*, 331 B.R. at 474.

> The plan does not need to guarantee success, but it must present reasonable assurance of success. *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir.1988). To provide such reasonable assurance, a plan must provide a realistic and workable framework for reorganization.

*In re Made in Detroit, Inc.*, 299 B.R. 170, 176 (Bankr.E.D.Mich.2003). "The feasibility test requires only a showing that the plan offers a reasonable assurance of success, not a guarantee of success." *In re New Midland Plaza Associates*, 247 B.R. 877, 884 (Bankr.S.D.Fla.2000).

### B. The Debtor's Plan

The Debtor is seeking to confirm its Second Amended Chapter 11 Plan. (Doc. 194). Generally, the Plan provides that the Debtor "will obtain sufficient exit financing to pay in cash on the Effective Date, the Allowed Claims of Classes 1 through 10 and for ongoing operations of the Park." (Doc. 194, pp. 9–10).

The "Allowed Claims of Classes 1 through 10," to be paid in cash under the Plan, consist of Administrative Expense Claims, including claims for professional fees (Class 1), the secured claim of Sportsman's Cove Partnership (Class 4), other secured claims (Class 5), and general unsecured claims (Classes 8 and 9).

The "Effective Date" of the Plan, or the date upon which the Claims are to be paid, is defined to mean "that date upon which the Confirmation Order becomes a Final Order." (Doc. 194, Second Amended Plan, Exhibit A, p. 5).

The essence of the Debtor's Plan is set forth in Exhibit 2 to its Confirmation Affidavit. (Debtor's Exhibit 17).

As reflected in the Order Granting in Part Debtor's Motion for Authority to Obtain Credit Under 11 U.S.C. sec. 364 (the "DIP Financing Order"), HUDO Lending, LLC has committed to provide to the Debtor total funds in the amount of $1.4 million. Of this amount, $1,005,925.30 has already been utilized, in accordance with the DIP Financing Order, to satisfy the claims of Joyce and Vessie Miller in the compromised amount of $885,000, the Citrus County Tax Collector in the amount of $88,718.76 and to fund the Debtor's operations up to $3,000.00. The funds remaining (after satisfaction of the above listed amounts and closing costs) and committed to the Debtor total $394,074.70.

(Debtor's Exhibit 17).

In the Confirmation Affidavit, the Debtor asserts that the "claims to be satisfied" under its Plan total $350,913.10. These claims consist of the professional fees of Trenam Kemker, P.A., Morse & Gomez, P.A., and Stichter, Riedel, Blain & Prosser, P.A., the secured claim of Sportsman's Cove Partnership, the unsecured claims of Carole Steigele and the Homosassa Water District, and the claim for "out of pocket expenses" of Ridley.

In its calculation of claims to be paid, the Debtor excluded the professional fees of Peggy Burke BeVille, Chesser & Barr, P.A., and Richard Childs, Esquire, because the Debtor has objected to the allowance of the claims. (Exhibit 2 to Debtor's Exhibit 17, n. 1).

## 1. Good faith

The Court finds that the Debtor's Second Amended Plan cannot be confirmed because it was not proposed in good faith within the meaning of § 1129(a)(3) of the Bankruptcy Code.

The single, most important factor in determining that the Plan was not proposed in good faith is the Debtor's knowing concealment from the Court of the contract to sell substantially all of its assets.

Andrea Trani and Helene Provenzano, the principals of the Debtor, signed the Vacant Land Contract to sell the Debtor's property on February 29, 2004. (Debtor's Exhibit 2).

Trani and Provenzano both initialed a handwritten "additional term" to the Contract, stating that "any sale of its [the Debtor's] assets may require approval of the Federal Bankruptcy Court." (Transcript, p. 146). The principals were aware that the property was under the supervision of the Bankruptcy Court, and that any sale of the property required Court approval.

Further, a deposit in the total amount of $45,000.00 was accepted from Ridley, the purchaser, on or about March 1, 2004 (Debtor's Exhibit 3). Funds from this deposit were used for the benefit of the Debtor, to remedy code violations at the Debtor's property, and the sale was ostensibly pursued.

Nevertheless, the Debtor completely failed to disclose the existence of the Contract at the hearing to consider confirmation of the Debtor's original Plan on May 3, 2004. In fact, the Debtor filed an Amended Plan of Reorganization on the day of the confirmation hearing, which stated that the "payments due under this

Plan shall be made out of profits derived from Debtor in the ordinary course of business." (Doc. 141, Article IV). The Amended Plan, which was signed by Trani, does not mention the Vacant Land Contract.

At the confirmation hearing on May 3, 2004, Debtor's counsel even suggested to the Court that the Debtor proposed to retain the Park and refinance the property for further development. Debtor's counsel stated:

But by the fact that you will enter an order confirming the plan, it will open access to refinancing. And this is a mobile home park that will be developed. It's on the water and so it has a very good potential, and the owner is experienced in that kind of business.

(Ridley's Exhibit 5, Transcript of May 3, 2004, hearing, p. 6). Trani was present at the confirmation hearing.

The Court is satisfied that the concealment of the proposed sale was knowing and intentional. The basis for this determination is two-fold.

First, the owner of Real Title Services testified at trial that his company was asked to serve as the closing agent for the proposed sale. (Transcript, pp. 36, 39). The owner of the title company also is an attorney, and represented Joyce Miller in the bankruptcy case. He testified that he and the Debtor's counsel discussed the existence of the Contract prior to the confirmation hearing on May 3, and that they also discussed whether the Contract should be disclosed to the Court. (Transcript, p. 50). He testified:

Ms. Isaak convinced me that it [the Contract] was irrelevant to confirmation. Now, I just feel compelled to say that I don't feel the same way now, for obvious reasons. However, Ms. Isaak convinced me that the sale contract was irrelevant to confirmation because everyone was getting paid. And with the absence of just one release, by I believe it was an insider named Steigele, that she would prefer it not to be discussed, unless asked.

(Transcript, pp. 51–52). Clearly, the failure to disclose the existence of the proposed sale was the result of a deliberate decision on the part of either the Debtor, or Debtor's counsel, or both.

Although the motive for the decision was not fully developed at trial, it appears that the nondisclosure may have been the result, at least in part, of separate negotiations between the Debtor's counsel and the Debtor's principals for the development of the property outside of the Chapter 11 case. When asked about her communications with the title company attorney, for example, Trani testified that she thought he would be more objective than the Debtor's counsel on certain issues, because "my attorney was very aggressively trying to joint venture this property with me and my family—become a partner on it." (Transcript, p. 167).

The second basis for this conclusion concerns the extent to which the Debtor continued to deal with Ridley, the proposed purchaser, after the confirmation hearing on May 3, 2004.

Just two weeks after the hearing, for example, on May 18, 2004, a check from Ridley in the amount of $20,000.00 (Ridley's Exhibit 19) was accepted to fund the removal of certain mobile homes from the Debtor's property in preparation for the sale. (Transcript, p. 262).

Further, the agreed closing date under the Contract was July 25, 2004. (Debtor's Exhibit 2). On July 23, 2004, however, Trani and Provenzano acknowledged that they had "agreed to extend the contract thru Wednesday, 7/28/04, for an additional non-refundable deposit of $30k." (Debt-

or's Exhibit 19). Then, on July 26, 2004, Trani wrote that Trani and Provenzano were "ready, willing, and able to close this contract today." (Debtor's Exhibit 10).

The Vacant Land Contract was entered on February 29, 2004, two months before the confirmation hearing on May 3, 2004. Payments were made by Ridley that were used for the benefit of the Debtor. The existence of the Contract was not disclosed either in an Amended Plan filed on the day of the hearing, or at the confirmation hearing itself. The concealment was knowing and intentional, as evidenced by the events and discussions surrounding the hearing, and also by the Debtor's continued interest in the Contract after the hearing.

The Contract was disclosed to the Court by Ridley and Sportsman's Cove Partnership in August of 2004.

On September 14, 2004, the Court entered an Order vacating the prior Order of Confirmation. In the Order, the Court found that "significant material omissions" had occurred in the case. (Doc. 179).

One month later, on October 14, 2004, the Debtor filed the Second Amended Plan that is currently under consideration.

The Second Amended Plan was not proposed in good faith.

■■ As set forth above, in determining whether a plan was proposed in good faith, the primary focus is on the plan itself, and whether it will achieve a result that is consistent with the objectives of the Bankruptcy Code. *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir.1995). In making the determination, courts view the totality of the circumstances surrounding the plan, and particularly consider the postpetition conduct of the plan proponent. *In re Georgetown Limited Partnership*, 209 B.R. 763, 769 (Bankr.M.D.Ga.1997).

In this case, the Debtor's postpetition conduct has evidenced a disregard for the judicial process and for the purposes of the reorganization provisions. See *In re Valley View Shopping Center, L.P.*, 260 B.R. at 27–28. By actively concealing the Vacant Land Contract from the Court, the Debtor demonstrated its unwillingness to observe the rules governing the Chapter 11 process, even though it had enjoyed the protections and benefits afforded by the Bankruptcy Code.

"The failure to disclose relevant information in a bankruptcy case has been held to be a sufficient basis for finding bad faith in the proposal of a plan." *In re Georgetown Limited Partnership*, 209 B.R. at 769.

The Debtor knowingly and intentionally failed to disclose relevant information in this case.

Further, the Debtor's Second Amended Plan was not filed until after its failure was brought to the attention of the Court by Ridley and an affected creditor. In the Plan, the Debtor essentially asks the Court to overlook its abuse of the process, and to restore it to the position of control that it possessed before its wrongdoing. "This is not the 'honest but unfortunate debtor' that our system of bankruptcy envisions." *Id.* at 770.

The Debtor's Second Amended Plan was not proposed in good faith, and therefore may not be confirmed because it does not satisfy the requirement for confirmation set forth in § 1129(a)(3) of the Bankruptcy Code.

### 2. Feasibility

■ Section 1129(a) expressly provides that all of the requirements contained in the section must be satisfied as a condition to confirmation. 11 U.S.C. § 1129(a). The Court has found that the Debtor's Second Amended Plan does not satisfy the requirement contained in § 1129(a)(3).

Consequently, the Plan as proposed is not confirmable, and it is not necessary to consider any of the other conditions required by § 1129(a).

Nevertheless, the Court also finds that the Debtor's Plan does not satisfy the requirement for confirmation set forth in § 1129(a)(11) of the Bankruptcy Code. The Debtor has not shown that confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11).

The Debtor's Second Amended Plan provides, with respect to its "means of implementation," that the Debtor will obtain sufficient exit financing to pay the allowed claims of all creditors in cash, and also to fund the ongoing operations of the Park. (Doc. 194).

The postpetition loan from HUDO Lending, LLC constitutes the Debtor's "exit financing." The total amount of the loan that would be extended if the Plan were confirmed is $1,400,000.00. (Doc. 405, Exhibit B). In its feasibility analysis, therefore, the Debtor states that the sum of $394,074.70 would be available from the loan proceeds to pay allowed claims under its Plan. ($1,400,000.00 less $1,005,925.30 previously funded = $394,074.70). (Attachment 2 to Debtor's Exhibit 17).

As shown above, however, the amount that would be required to pay all of the existing claims against the estate (other than the postpetition lien of HUDO), in cash, is $431,786.40. This consists of the secured claim of Sportsman's Cove Partnership ($40,721.58), the secured claim of Swan Family Ltd. and First Union ($13,776.39), the aggregate of the claims for professional fees ($207,753.43), the claim of Ridley for out of pocket expenses ($108,610.00), and the unsecured claims of Steigele and the Homosassa Water District ($60,925.00).

Accordingly, it does not appear that the funds that would be available from the Debtor's "exit financing" are sufficient to satisfy all of the outstanding claims against the estate in full on the Effective Date of the Plan, as defined by the Debtor.

Additionally, the Debtor has not provided any information regarding the nature of the "ongoing operations" referred to in its Plan, and has offered no projections regarding any future income. The Debtor has never operated profitably in the past, however, and has not implemented any business plan during the Chapter 11 case to show that it can be managed successfully in the future. Trani testified that the Debtor had "always had a negative cash flow," for example, (Transcript, p. 169), and it appears that many of the mobile homes that previously were located on the property have now been removed. Further, as late as June of 2005, after the Debtor had enjoyed the protections of Chapter 11 for more than three years, the Debtor still needed the sum of $3,000.00 from the HUDO loan simply to fund its daily operations (Doc. 429, p. 5).

The loan from HUDO is payable in installments of $500.00 per month, representing interest only, "with unpaid interest accrued and payable at maturity." (Exhibit "B" to Doc. 405, Commitment Letter from HUDO).

The term of the loan from HUDO is eighteen months.

The loan is secured by a "first priority senior security interest in and lien upon the Proud Mary Property," pursuant to the Order authorizing the Debtor to obtain the postpetition credit. (Doc. 429).

Under these circumstances, the Debtor has not demonstrated that it will be able to make its monthly interest payments to HUDO, in addition to satisfying its normal

business expenses, after paying the claims and expenses associated with the Chapter 11. Further, while the Debtor may be able to sell or refinance the property before the HUDO loan matures in eighteen months, the Court is unable to conclude that confirmation of the Debtor's Plan is not likely to be followed by the need for further reorganization.

The Debtor's Second Amended Plan does not satisfy the requirement for confirmation set forth in § 1129(a)(11) of the Bankruptcy Code, and therefore is not confirmable.

## C. Ridley's Plan

Ridley filed a Chapter 11 Plan and Disclosure Statement on October 1, 2004. (Docs. 187, 188). The Order approving the Disclosure Statement was entered on December 28, 2004. (Doc. 256).

On August 3, 2005, Ridley filed her Amended Chapter 11 Plan and Amended Disclosure Statement. (Docs. 492, 493).

Essentially, Ridley's Amended Plan proposes to pay all of the allowed claims against the estate "in full on the Effective Date from the proceeds of the closing of the sale of the Property to Ridley." (Doc. 492, pp. 5–7). The Effective Date is defined as "the date thirty (30) days after the order of confirmation becomes final and non-appealable." (Doc. 492, p. 3).

Pursuant to Article III, entitled "Means to Effectuate Amended Plan," Ridley proposes:

> The Amended Plan will be effectuated by the sale of all or substantially all of the Debtor's real property to Ridley for the sum of $2,500,000.00. Ridley has heretofore paid the sum of $45,000.00 as an earnest money deposit; therefore, pursuant to the Contract, the amount due at closing is $2,455,000.00.

(Doc. 492, p. 7). The Vacant Land Contract is attached to the Amended Plan as Exhibit "A," and the Plan provides that the "Seller under the Contract is deemed to be the Debtor, and the Debtor shall be bound by the Contract as the Seller." (Doc. 492, p. 7).

The Amended Disclosure Statement provides that "Ridley is the purchaser under the Ridley Plan and the Contract to purchase the Debtor's Property for $2,500,000.00," and that "Ridley is ready, willing, and able to close the sale and purchase the Property pursuant to the terms of the Contract and the Ridley Plan." (Doc. 493, p. 8).

Ridley has assigned the Contract to Fishbowl Marina, Inc., which was formed for the purpose of acquiring the Debtor's property. (Transcript, p. 251).

### 1. Good faith

■ The Debtor objected to Ridley's Plan on the ground that the Plan was not proposed in good faith, among other grounds. (Doc. 478).

The objection is based in part on Ridley's failure to attach a commitment letter from a lending institution to her original Disclosure Statement (Doc. 188). Specifically, the Debtor suggests that the failure was an intentional omission on Ridley's part, because the Commitment Letter that she had initially obtained from First Federal Savings Bank had expired by the time that the Disclosure Statement was filed. Consequently, the Debtor suggests that the omission evidences Ridley's effort to conceal her inability to finance the purchase of the Debtor's property. (Doc. 478, pp. 8–9).

The Debtor further contends that the Order approving Ridley's original Disclosure Statement should be vacated, because the information furnished in the original document is no longer valid. Specifically,

the original Disclosure Statement contemplated financing by First Federal or another lending institution, whereas the Amended Disclosure Statement contemplates financing by Ridley's partners in Fishbowl Marina, Inc. (Doc. 478).

The Court finds that the Debtor's Motion for Order Vacating Order Approving Disclosure Statement of Kathy Ridley should be denied, and that the Order Approving Ridley's original Disclosure Statement should not be vacated.

The Court also concludes that Ridley's Amended Plan was proposed in good faith, despite her failure to attach a commitment letter to her original Disclosure Statement. The omission does not evidence any intent on Ridley's part to achieve a result inconsistent with the purposes of the Bankruptcy Code. *In re Bravo Enterprises*, 331 B.R. at 472.

Donald Turner (Turner) was a Vice President of First Federal Savings Bank at the time that the loan to Fishbowl Marina, Inc. was approved in July of 2004. (Ridley's Exhibit 9). Turner testified at the confirmation hearing that the Bank wanted to make the loan, and that the Bank was "prepared to even make it after it [the commitment letter] expired." (Transcript, p. 105). The Bank's position in this regard was based on the financial strength of the borrower and the guarantors, and the Bank's conclusion that it "was a good loan." (Transcript, p. 106). In fact, Turner testified that "[a]ny bank probably would have approved the loan." (Transcript, p. 106).

Further, Ridley testified that her two partners, Harry Laird and Charles Faircloth (Faircloth), had originally planned to fund the purchase, but they subsequently decided to obtain traditional bank financing. (Transcript, pp. 251, 273–74). Then, when the sale was unable to close on the scheduled date, and after she learned that Turner was no longer employed at First Federal, Ridley and her partners again decided to fund the purchase through an investment from Faircloth. (Transcript, pp. 252, 275–77).

A commitment letter from Faircloth is attached to Ridley's Amended Disclosure Statement. (Doc. 493).

Under these circumstances, the Court cannot find that Ridley engaged in any inappropriate efforts to conceal material information from creditors or from the Court. On the contrary, Ridley has steadily maintained that Fishbowl Marina, Inc. is financially able to pay for the Debtor's property in cash. Finally, the Court finds that Ridley's explanation for the alternative sources of financing is credible.

Ridley's Amended Plan was filed in good faith and therefore satisfies the requirement for confirmation set forth in § 1129(a)(3) of the Bankruptcy Code.

### 2. Feasibility

██ Further, the Court finds that confirmation of Ridley's Amended Plan is not likely to be followed by the need for further reorganization of the Debtor within the meaning of § 1129(a)(11) of the Bankruptcy Code.

Ridley's Amended Plan is predicated on the sale of the Debtor's property to Fishbowl Marina, Inc. for the purchase price of $2,500,000.00. (Doc. 492).

The Amended Plan, as proposed, provides that the purchase price will be funded by Charles Faircloth. Faircloth has furnished a written commitment letter dated August 2, 2005, which states as follows regarding the Proud Mary Marina Property:

I, Charles Faircloth, do hereby agree to fund the acquisition of above referenced property up to $2.8 million subject

only to clear title and the approval of the Bankruptcy Court.

This letter of commitment is good for six months from this date.

(Ridley's Exhibit 18). Faircloth is the treasurer of Fishbowl Marina, Inc., the proposed purchaser of the property. (Transcript, p. 251).

Ridley testified at the confirmation hearing that she has known Faircloth for approximately five years, and that they have been involved in extensive business transactions during that time. (Transcript, p. 256). Ridley testified, for example, that she was the realtor in transactions during the current year in which Faircloth bought or sold property valued at approximately $90,000,000. (Transcript, pp. 256, 278). She also testified that she was the realtor in transactions in 2004 in which Faircloth bought or sold property worth approximately $70,000,000. Further, Ridley testified that these figures represent only a portion of Faircloth's total real estate dealings during the two years cited. (Transcript, p. 256). According to Ridley, Faircloth is typically involved in sales or purchases where the contract price is between $15,000,000 and $20,000,000. (Transcript, p. 260).

Finally, Ridley testified that Faircloth and Laird "always had the money to fund this Plan," and that she would be able to place the full purchase price in an escrow account within ten days of an order confirming her Plan. (Transcript, pp. 261, 277).

Ridley's testimony is corroborated by the testimony of Donald Turner and Harry Laird.

As discussed above, Turner formerly was the Vice President of First Federal Savings Bank. Turner signed the Commitment Letter approving the loan to Fish-

bowl Marina, Inc. for the purchase of the Debtor's property. (Ridley's Exhibit 9).

Faircloth and Harry Laird, along with Ridley, were listed as guarantors of the Bank's proposed loan to Fishbowl Marina. (Ridley's Exhibit 9). It appears that the Bank received a signed financial statement from Faircloth in connection with its investigation of the borrower, and also received Laird's financial statement and tax returns. (Transcript, pp. 108, 118).

Based on the investigation, Turner testified that the Bank was willing to make the loan to Fishbowl Marina well after the commitment letter expired. The reason for the Bank's continued willingness, according to Turner, was that the borrowers and guarantors were well-qualified for the loan. In fact, Turner testified that the "financial strength of the borrower was as large as I'd ever seen in my banking career." (Transcript, p. 106). When asked about First Federal's position regarding the loan for as long as he was employed by the Bank, Turner stated that:

With the same borrowers and the same scenario, we would have approved the loan. Any bank probably would have approved the loan.

(Transcript, p. 106). Turner also testified, for example, that his current employer, Center State Bank, would likely loan Fishbowl Marina the money to purchase the Debtor's property, if requested. (Transcript, p. 110).

Finally, Harry Laird is a one-third owner and financial partner in Fishbowl Marina, Inc. (Transcript, pp. 116–17). Laird testified at the confirmation hearing that he furnished the earnest money deposit that was paid to the Debtor in February of 2004 in the amount of $45,000. (Transcript, p. 117).

Laird is a real estate developer. The value of his interest in his current develop-

ment projects is between $12,000,000 and $15,000,000. (Transcript, pp. 118, 121).

Laird testified that he had $1,700,000 in cash on hand as of the date of the confirmation hearing, and that he also had access to a $1,000,000 line of credit on that date. Consequently, Laird testified that he had the ability to write a check for the full amount of the purchase price of the Debtor's property as of the confirmation hearing, if necessary. (Transcript, p. 124).

Despite his ability to fund Fishbowl Marina's purchase of the Debtor's property, however, Laird testified that Faircloth is the true financial force behind the project. (Transcript, p. 132).

Given the testimony of Ridley, Turner, and Laird, and the entire record in this case, the Court finds that Ridley has provided reasonable assurance that Fishbowl Marina, Inc. has the financial ability to fund the purchase of the Debtor's property. *In re Made in Detroit, Inc.*, 299 B.R. at 176; *In re New Midland Plaza Associates*, 247 B.R. at 884. The Plan is not a visionary scheme beyond Fishbowl Marina's ability to attain.

The purchase price for the property is $2,500,000.00, less the earnest money deposit of $45,000.00 previously paid, for a remaining balance of $2,455,000.00. (Doc. 492, p. 7). The claims against the estate that must be paid under Ridley's confirmed Plan total approximately $1,437,711.70, including satisfaction of the postpetition lien of HUDO in the amount of $1,005,925.30. ($1,005,925.30 + $431,786.40 representing the secured claims, claims for professional fees, administrative claim of Ridley, and unsecured claims described above = $1,437,711.70).

The purchase would produce sufficient funds to pay the claims of the Debtor's creditors in full.

Based on the foregoing evidence and conclusions, the Court finds that confirmation of Ridley's Amended Plan is not likely to be followed by the need for further reorganization. Accordingly, the Amended Plan satisfies the requirement for confirmation contained in § 1129(a)(11) of the Bankruptcy Code.

### Conclusion

The Debtor, Proud Mary Marina Corporation, and Kathy Ridley, filed competing Chapter 11 Plans in this case. The issue was whether one or both of the Plans was confirmable.

The Court finds that the Second Amended Plan of the Debtor is not confirmable because it does not satisfy the requirements for confirmation set forth in § 1129(a)(3) or § 1129(a)(11) of the Bankruptcy Code.

Specifically, the Debtor knowingly concealed from the Court a contract to sell substantially all of its assets to Ridley, at the same time that it actively sought the confirmation of a plan to be funded from the continued operation of its business. The Debtor filed its Second Amended Plan, which is currently under consideration, only after its deception was brought to the Court's attention by Ridley and an affected creditor, and after the Order confirming its original plan was vacated. The Second Amended Plan was not proposed in good faith within the meaning of § 1129(a)(3) of the Bankruptcy Code.

Second, the Debtor has not demonstrated that the funds available from its "exit financing" would be sufficient to pay all of the claims asserted against the estate in full, or that it would be able to service its postpetition loan from HUDO Lending, LLC out of profits from its future operations. Consequently, the Second Amended Plan does not satisfy the feasibility requirement contained in § 1129(a)(11) of the Bankruptcy Code.

The Court further finds, however, that the Amended Chapter 11 Plan filed by Kathy Ridley satisfies the requirements for confirmation provided by § 1129, and that Ridley's Amended Chapter 11 Plan should be confirmed.

First, Ridley's Plan was proposed in good faith and not by any means forbidden by law, as required by § 1129(a)(3) of the Bankruptcy Code. Ridley's good faith is not affected by her failure to attach the commitment letter from First Federal Savings Bank to her original Disclosure Statement filed on October 1, 2004, or by her substitution of an alternative source of financing in her Amended Plan and Disclosure Statement.

Second, confirmation of Ridley's Plan is feasible, as required by § 1129(a)(11) of the Bankruptcy Code. Ridley has provided reasonable assurance that Fishbowl Marina, Inc. will be financially able to fund the purchase of the Debtor's property, and that the proceeds from the sale will be sufficient to satisfy the claims against the estate in full.

Ridley's Amended Chapter 11 Plan should be confirmed.

Accordingly:

**IT IS ORDERED** that:

1. The Amended Chapter 11 Plan of Reorganization filed by Kathy Ridley (Doc. 492) is confirmed.

2. Confirmation of the Second Amended Chapter 11 Plan of the Debtor (Doc. 194) is denied.

3. The Motion to Fix the Amount of All Claims and Administrative Expenses for Confirmation, filed by Kathy Ridley, is denied.

4. The Motion for Order Vacating Order Approving Disclosure Statement of Kathy Ridley, filed by the Debtor, Proud Mary Marina Corporation, is denied.

5. The Motion for Estimation of Application for Payment of Administrative Expense Claims of Kathy Ridley, filed by the Debtor, Proud Mary Marina Corporation, is granted as set forth in this Order.