**IN RE: BRANDYWINE TOWNHOUSES, INC., Debtor.**

**CASE NO. 13–75582–BEM**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed November 7, 2014

Rodney L. Eason, The Eason Law Firm, College Park, GA, for Debtor.

John D. Schlotter, Aldridge Connors LLP, Atlanta, GA, for Federal National Mortgage Association (Fannie Mae).

David S. Weidenbaum, Office of the U.S. Trustee, Atlanta, GA, for Office of the United States Trustee.

Nathan A. Wood, McGuire Woods, LLP, Atlanta, GA, for Georgia Power Company.

### ORDER

Barbara Ellis–Monro, U.S. Bankruptcy Court Judge

This Chapter 11 case came before the Court for a hearing (the "Hearing") on September 17, 2014, on confirmation of Debtor's Amended Plan of Reorganization (the "Plan") [Doc. No. 124] and the "Objection of Federal National Mortgage Association, d/b/a Fannie Mae to Debtor's Amended Plan of Reorganization (Docket No. 124)" (the "Objection"). [Doc. No. 128]. Rodney Eason appeared on behalf of Debtor, John Schlotter appeared on behalf of Creditor Federal National Mortgage Association, d/b/a Fannie Mae ("Fannie Mae"), and David Weidenbaum appeared on behalf of the United States Trustee. At the Hearing, testimony was presented, Debtor's Exhibits 1–3, 5, 7–8 were admitted, and counsel presented opening and closing arguments. After carefully considering all of the evidence presented, applicable authorities, the arguments of counsel and the entire record of this case, the Court now enters its findings of fact and conclusions of law as provided by Fed. R. Bankr.P. 7052 as applied by Fed. R. Bankr.P. 9014.

### I. FACTS

Debtor is a Georgia non-profit company which owns a low and moderate-income housing cooperative consisting of 238 apartments located at 85 Mt. Zion Rd., SW, in Atlanta, Georgia (the "Property"). Cooperative housing developments are owned by residents who each own a share in the cooperative. The co-op model provides certain tax benefits to residents. Debtor has been in operation for over for-

ty years. Debtor provides "Section 8" housing pursuant to a contract with the U.S. Department of Housing and Urban Development. [D. Ex. 7][1].

In 2010 and 2011, Debtor's management company failed to pay over $400,000 in obligations due to the City of Atlanta Department of Watershed Management ("Watershed"). In 2013, Debtor's secured creditor, Fannie Mae, through its loan servicer Arbor Commercial Funding, LLC, made a partial payment of Debtor's past due obligations after Debtor received a final disconnection notice from Watershed. Following the partial payment, Fannie Mae successfully moved the Fulton County Superior Court for appointment of a receiver. A receiver was appointed on September 19, 2013, and the receiver paid the outstanding water bill. On November 25, 2013, Debtor filed this case.

Debtor filed its initial plan of reorganization on August 1, 2014 and the Plan on August 28, 2014. [Doc. Nos. 87, 124]. The Plan provides for payment in full to all creditors over 5 years through cash flow generated by the continued operation of Debtor's Property. The Plan contains 4 classes of claims and 1 interest class. Each of the classes of claims is impaired. Fannie Mae's secured claim is treated in Class 1, the secured claims of Metro Area Service in the amount of $4,575, and the secured claim of Atlanta Reliable Roofing Co. in the amount of $1,987 are in classes 2A and 2B respectively. Class 3, is a convenience class that is a class of unsecured creditors with allowed claim amounts of less than $1,000, and Class 4 contains other general unsecured creditors. The Plan provides to pay Class 4 claimants in full with interest of 3.25% over three years beginning in year two of the Plan. Class 3 creditors will be paid in five equal monthly installments during the first year of the Plan. The Plan provides that classes 2A and 2B will receive a $1,000 payment within 30 days of the Effective Date[2] plus 10 equal monthly payments during the first year of the Plan. Classes 2A, 2B, 3 and 4 voted to accept the Plan.

Fannie Mae is the largest creditor in the case with a claim totaling $5,012,392.86. The secured portion of Fannie Mae's claim, in the amount of $4,956,395.11 is treated in Class 1. The Plan proposes to pay Fannie Mae's secured claim through issuance of a promissory note (the "New Note"). The New Note provides for payment in full of Fannie Mae's secured claim with interest of 5.25% over 360 months, beginning 6 months after the Effective Date, at a rate of $27,369.40 per month. The Plan provides further that during the first 6 months of the Plan Debtor will use funds that would otherwise be paid to Fannie Mae for renovation of Debtor's Property including repair of 29 vacant apartments. The six-month forbearance of payments to Fannie Mae would provide Debtor with $164,216.40 with which to pay for the repairs and maintenance. Debtor argues that the repairs are necessary to reach its goal of 90% occupancy. In addition to the New Note, Debtor will maintain property insurance and pay all property taxes on the Property.

Debtor engaged George A. Smith ("Smith"), a general contractor with 36–37 years of experience to provide estimates for the cost of repair of 29 apartment units and certain exterior repairs necessary to ensure the safety of the residents. In preparing his cost estimates, Smith visited Debtor's property and inspected 3 or 4

---

**1.** References to Exhibits are as follow: "D. Ex. # " refers to Debtor's Exhibit # .

**2.** Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Plan.

units needing renovation. From his inspection of these units, Smith submitted a budget for the costs of repairs. [D. Ex. 3]. Smith estimated that the repair of 29 units would cost $162,635.00. [D. Ex. 3]. Smith estimated that the cost of the outside safety repairs would be $26,450. [D. Ex. 3]. On cross-examination, Smith acknowledged that renovation costs could exceed his estimate because he had not seen all 29 units. Further, Mr. Smith did not know the age of the heating and air conditioning systems which, if the unit(s) needed to be replaced, would cause significant increase in the costs of renovation.

Alton Management Corporation ("Alton") and its principal Mr. Alfred Reynolds ("Reynolds") have been managing cooperative resident developments since 1969. Alton managed Debtor's property in the early 2000s and then again beginning in 2011. Reynolds testified that Debtor's water bill tripled because of sewer repairs in Atlanta and that the Debtor paid these increased bills as it could and that the bankruptcy filing was the result of a "perfect storm" of increased water bills, increased water consumption, and residents' loss of income, all of which resulted in an inability to rehabilitate the property. Reynolds testified further that Alton is working to reduce water usage and would like to install a new metering system that would allow Debtor to charge its residents for water usage. Reynolds further testified that achieving 90% occupancy is "doable" and Debtor proposes to accomplish its target occupancy level turning vacant units into rented units and that 29 units need to be renovated to reach the 90% occupancy goal. Reynolds further stated that Debtor's property is desirable and that there are tenants waiting to move in. The Plan budgets and projections as well as Debtor's monthly operating reports were prepared at Reynolds' direction and under his supervision.

## II.  CONCLUSIONS OF LAW

### A.  Confirmation Requirements of § 1129(a)

■ Section 1129(a) of the Bankruptcy Code sets forth sixteen requirements for confirmation of a plan and states, in part, "[t]he court shall confirm a plan only if all of the following requirements are met. . . ." 11 U.S.C. § 1129(a). "To confirm a plan of reorganization the debtor has burdens as to introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied." *In re Diplomat Constr., Inc.*, No. 09–68613–MGD, 2009 WL 6498180, at *2 (Bankr. N.D.Ga. Nov. 20, 2009) (Diehl, J.) (citing *In re Acequia, Inc.*, 787 F.2d 1352, 1359 (9th Cir.1986)). When all elements of § 1129(a) are met except acceptance by all impaired classes under subsection (a)(8), the plan may still be confirmed pursuant to § 1129(b) as long as it does not discriminate unfairly and is fair and equitable. Because Fannie Mae voted against the Plan, it is non-consensual and must satisfy the fair and equitable requirements as well as the factors set forth in § 1129(a), however, prior to considering whether a plan satisfies § 1129(b) it must first satisfy each of the applicable § 1129(a) factors. *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 653 (9th Cir.1997) (citing *In re L & J Anaheim Assoc.*, 995 F.2d 940, 942 (9th Cir.1993); *In re Bravo Enter. USA, LLC*, 331 B.R. 459, 466 (Bankr.M.D.Fla.2005); *Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R. 668, 678 (Bankr.D.Ma. 2000)). Fannie Mae objects to confirmation and argues that the Plan is not feasible and is not fair and equitable and thus fails to satisfy § 1129(a)(11) and § 1129(b). The Court will first consider whether Debtor has established that the Plan is feasible within the meaning of § 1129(a).

■ Section 1129(a)(11) states that for a plan to be confirmed, it must be

feasible in that, "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

The use of the word, likely, requires the Court to assess whether the plan offers a reasonable "probability of success, rather than a mere possibility." While § 1129(a)(11) does not require the debtor to guarantee success, establishing feasibility requires more than a promise, hope, or unsubstantiated prospect of success. The purpose of the feasibility requirement [ ]is to prevent confirmation of visionary schemes which promise creditors and equity holders more under a proposed plan that the debtor can possibly attain after confirmation. A determination of feasibility must be "firmly rooted in predictions based on objective fact."

*In re Diplomat Constr., Inc.*, 2009 WL 6498180, at \*2 (internal citations omitted). Courts consider the earning power of the business, its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation to determine feasibility of the plan. *Id.*

The evidence presented does not establish a reasonable and objective likelihood of success under the Plan. The Plan's success hinges on increasing occupancy to 90%. Debtor proposes to accomplish this by deferring payments to Fannie Mae for six months, and using the funds that would be paid to Fannie Mae, in the amount of $27,369.40 per month, to fund renovation of 29 apartment units. Debtor then projects in year 2 that it will have leased each of the 29 units to reach its 90% occupancy goal. The ability to fund these repairs is not supported by the evidence. Debtor has been making monthly adequate protection payments of $19,700 to Fannie Mae. Debtor proposes to defer these amounts plus an additional $7,669 per month to fund renovations. Debtor's performance since filing this case does not support Debtor's ability to fund the costs of renovations because Debtor has experienced negative net operating income in five of eight months from December, 2013 through July, 2014. *See* [Doc. Nos. 70, 82, 91, 94, 123]. As a consequence, Debtor does not have any cash reserves to fund the proposed renovations and is not generating sufficient income to pay for the proposed renovations. As a result, the evidence presented does not establish a reasonable probability that Debtor will be able to generate funds sufficient to renovate 29 units or to fund the increased monthly payments to Fannie Mae required by the New Note.

Even if it were probable that Debtor could fund renovation of the 29 units, it is questionable whether the units would generate income sufficient to support Debtor's proposed Plan payments. Debtor's monthly operating reports show, on average, a negative cash flow of $6,318 per month between December and July. Debtor projects increased monthly rental revenue of $11,739 from rental of 29 additional apartment units. [D. Ex. 5]. Assuming Debtor is able to rent the 29 additional units, on average, it is still $2,248 per month short of the funds necessary to pay the New Note payment amount. Further, although Debtor's manager, Reynolds, testified that Debtor's complex is very desirable and that his staff had to turn away potential residents because they did not know when units would be available, only 17 people are on the waiting list for apartments which is not sufficient to increase occupancy to 90%. Further, it is unclear if these individuals remain inter-

ested in renting from Debtor since a number of the applications are from 2011, 2012 and 2013. [D. Ex. 1].

In addition, the evidence showed that Debtor's projections overestimate revenue and underestimate operating expenses. [D. Ex. 8]. Specifically, the evidence showed that in April the revenue was $94,713.88 rather than $108,172.29. Adjusting for this error, results in $100,452 in projected monthly income and $1,205,424 annual income in year 1. After accounting for operating expenses, which are estimated at $54,626 per month or $655,514 annually, $549,910 remains to pay plan expenses in year 1. Debtor projects plan expenses of $656,222 in year 1, thus Debtor's own projections do not support a finding that the Plan is feasible. Moreover, the Plan budget is static on the expense side and fails to account for anticipated increases in utility expenses which would be caused by increasing occupancy to 90%.

Debtor urged the Court to look behind the monthly operating reports to Debtor's bank statements which Debtor argues support the proposition that Debtor has in fact had positive cash flow. The Court has reviewed the bank statements for the months of December through July. It is apparent from this review that Debtor's largest bank balance occurred in January after the receiver turned $50,119 over to Debtor and that over the course of the next six months that balance has been reduced from $98,117.55 to $12,207.59. This ending balance of $12,207.59 is subject to further reduction because of outstanding checks. In fact, Reynolds testified on cross examination that Debtor had approximately $573 in the bank as of the Hearing. Thus, rather than dissuading the Court that Debtor's net operating income has been negative during a majority of the time this case has been pending, the bank records reinforce the fact that Debtor's income is just not sufficient to fund

the Plan and that Debtor has no cash reserves with which to supplement its operating income.

There is no question that Alton and Reynolds are dedicated to Debtor's success. However, dedication alone is not sufficient to establish feasibility, and Debtor has not shown that the Plan has a reasonable probability of success because the budget projections are not supported by Debtor's performance to date and the budget is not reasonably reliable. Thus, Debtor has not satisfied the requirement of § 1129(a)(11) and the Plan cannot be confirmed.

Because the Plan is not feasible it is not confirmable and the Court need not address Fannie Mae's remaining objections.

### III. CONCLUSION

The Court cannot rely solely on Debtor's confidence in reorganization and its management company's good faith efforts to assist Debtor in reorganizing. The actions taken by Debtor and all involved have been commendable. However, the evidence shows that Debtor's income is not sufficient to fund the Plan and the Plan is not feasible. Accordingly for the reasons set forth herein, it is hereby

ORDERED that Confirmation is DENIED.

**IT IS ORDERED.**